Julia HUGHES *v.* STATE of Arkansas

CR 86-28                                               712 S.W.2d 308

Supreme Court of Arkansas
Opinion delivered July 21, 1986

*William R. Simpson, Jr.*, Public Defender, and *Howard W. Koopman*, Deputy Public Defender, by: *Carolyn P. Baker*, Deputy Public Defender, for appellant.

*Steve Clark*, Att'y Gen., by: *Mary Beth Sudduth*, Asst. Att'y Gen., for appellee.

DARRELL HICKMAN, Justice. Julia Hughes was convicted of murdering her two year old son, Anthony, by throwing him into a ditch where he drowned. Hughes had been in and out of the Arkansas State Hospital in recent years and although she had three children, none of them were in her exclusive custody. But on May 6, 1985, Anthony was with her.

There was an abundance of evidence of Hughes' guilt and she was sentenced to life imprisonment. Her conviction must be reversed because at one time during her interrogation she asked for a lawyer and the questioning did not cease. Her statements and actions thereafter should have been excluded from the evidence.

Hughes' parents notified the police after she left the house in the morning with Anthony and then returned home without him. When the child was not found, Hughes was picked up for questioning. She was read her rights and said she understood them, although she refused to sign a rights waiver form claiming that she could not read or write. She told the police she had thrown Anthony in the river and it was too late to get him any help. These statements were made to two police officers, Beavers and Alexander. No objection was made to their introduction.

Several hours later Detective LeMaster questioned her about Anthony's disappearance. Hughes stated that she did not know what they were talking about. Later she remarked it did not make any difference because he was gone. She said he was dead but then said maybe he was not and they should check on him. Eventually the conversation led back to her saying she did not know what the officers were talking about. Those statements are also not challenged by Hughes.

About 5:30 p.m., Eddie Montgomery, a deputy prosecuting attorney, and Becky Fribourgh, an employee of the prosecutor's office, were introduced to Hughes by LeMaster. At that point Hughes said she wanted to talk to a lawyer. LeMaster asked her who she wanted them to call and she did not reply; then he said, "Do you want us to call your attorney?" She still did not reply. LeMaster said it was very important that Anthony be found and that this was the most important thing right then. Montgomery and LeMaster left the room. Fribourgh, who knew Hughes previously through the SCAN program, got Hughes matches for her cigarettes and water and returned to the interview room. Hughes made an irrelevant remark that Fribourgh had crooked teeth, then apologized. Fribourgh asked Hughes what she had done that day and Hughes said she did not know what Fribourgh was talking about. Hughes then again asked Fribourgh what she had done that day. Fribourgh told her and Hughes said, "Well, you're too pretty to feel guilty about my baby. Do you think my baby's still alive?" Fribourgh said she did not know and asked where the baby was.

Several times Hughes said she did not know what Fribourgh was talking about. Fribourgh said she would ask another question or start talking about something else and Hughes would return to asking whether her baby was still alive. Once when Fribourgh asked where the baby was, Hughes said that she had "pitched him in the river." Fribourgh asked where and Hughes said Sweet Home and tried to give Fribourgh directions. She then offered to take Fribourgh to the spot. She asked if Fribourgh would get LeMaster. LeMaster came in and Hughes told him that she had thrown Anthony in the river around Sweet Home. He continued to talk to her and "finally" she said she would take him and show him. She led the officers and Fribourgh to the place where Anthony was found dead. After her return to the station, Hughes signed a waiver of rights and dictated an incriminating statement.

■ The trial judge ruled that Hughes had initiated further conversation and that she had waived her right to a lawyer. That is decidedly not the case. She did not waive the request and she did not initiate further conversation. The police and officials were bound to stop the interrogation when Hughes asked for a lawyer, which they did not do. Therefore her statements made after the request are inadmissible.

■ *Edwards* v. *Arizona*, 451 U.S. 477 (1981), laid down a clear and easy rule that interrogation must stop when a suspect asks for counsel. The Court said:

> When an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. We further hold that an accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges or conversations with the police.

We have followed *Edwards. Hendrickson* v. *State*, 285 Ark. 462, 688 S.W.2d 295 (1985); *State* v. *Branam*, 275 Ark. 16, 627 S.W.2d 8 (1982); *Dillard* v. *State*, 275 Ark. 320, 629 S.W.2d 291 (1982).

■ In *Smith* v. *Illinois*, 469 U.S. 91, 105 S.Ct. 490 (1984), the United States Supreme Court elaborated further on *Edwards*:

> An accused in custody, 'having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him,' unless he validly waives his earlier request for the assistance of counsel. *Edwards* v. *Arizona*, 451 U.S., at 484-485, 101 S.Ct., at 1885. This 'rigid' prophylactic rule, *Fare* v. *Michael C.*, 442 U.S. 707, 719, 99 S.Ct. 2560, 2569, 61 L.Ed.2d 197 (1979), embodies two distinct inquiries. First, courts must determine whether the accused actually invoked his right to counsel. See, *e.g., Edwards* v. *Arizona, supra*, 451 U.S., at 484-485, 101 S.Ct., at 1884-1885 (whether accused 'expressed his desire' for, or 'clearly asserted' his right to, the assistance of counsel); *Miranda* v. *Arizona*, 384 U.S., at 444-445, 86 S.Ct., at 1612 (whether accused 'indicate[d] in any manner and at any stage of the process that he wish[ed] to consult with an attorney before speaking'). Second, if the accused invoked his right to counsel, courts

may admit his responses to further questioning only on finding that he (a) initiated further discussions with the police,and (b) knowingly and intelligently waived the right he had invoked. *Edwards* v. *Arizona, supra*, 451 U.S., at 485, 486, N.9, 101 S.Ct., at 1885, n.9

There is no doubt that Hughes asked for a lawyer. That is conceded. Furthermore, the police officials knew it was their duty to furnish Hughes a lawyer. The questions to Hughes about who she wanted to call were obviously meant to discourage her from exercising her rights and not a good faith effort to comply with the law. The interrogation continued until she told them what they wanted to know.

▨▨ The United States Supreme Court defined interrogation in *Rhode Island* v. *Innis*, 446 U.S. 291 (1980):

'Interrogation,' as conceptualized in the *Miranda* opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself.

We conclude that the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating

response.

When Hughes asked for counsel, LeMaster asked who she wanted them to call and then emphasized that the most important thing was to find Anthony. Fribourgh went in with refreshments and asked Hughes what she had done that day. Fribourgh and LeMaster should have known that those remarks were likely to elicit an incriminating response. Hughes was already suspected of murder, she had been interrogated for several hours, and after she asked for a lawyer her request was not honored.

The *Edwards* rule is a clear one and officials can easily comply with it. Furthermore, it is also easy to determine when an accused initiates further conversation. For example in *Dillard* v. *State, supra*, Dillard told the sheriff he wanted an attorney but continued to ask questions and talk about the case. He was repeatedly told that if he wanted an attorney he should not say more, but Dillard chose to continue the conversation. We affirmed the admission of the statements.

Here the evidence obtained was not even necessary for the state's conviction. The state could have followed the *Edwards* rule and still would have had ample incriminating evidence. All the statements after Hughes requested counsel should have been excluded; that includes her statements to Fribourgh, the agreement to lead the police to the child, her statements in the car, and the statement she made upon her return to headquarters.

Under Ark. Stat. Ann. § 43-2725 (Repl. 1977), as put into effect by our Rule 11(f), we consider all objections brought to our attention in the abstracts and briefs in appeals from a sentence of life imprisonment or death. In this case we find no prejudicial error in the other points argued or in the other objections abstracted for review.

Reversed and remanded.

HOLT, C.J., not participating.