Larry Earl ESMEYER *v.* STATE of Arkansas

CR 95-1027                                        930 S.W.2d 302

Supreme Court of Arkansas
Opinion delivered September 16, 1996

*Murphy, Post, Thompson, Arnold & Skinner,* by: *J. T. Skinner* and *Tom Thompson,* for appellant.

*Winston Bryant,* Att'y Gen., by: *Kelly K. Hill,* Deputy Att'y Gen., for appellee.

ROBERT L. BROWN, Justice. Appellant Larry Earl Esmeyer appeals his convictions for first-degree murder and attempt to commit first-degree murder, and his sentence of 70 years' imprisonment. He argues that the jury was tainted, that the prosecuting attorney failed to disclose exculpatory evidence, that statements given to the police should have been suppressed, and that admission of his waiver-of-rights form into evidence and cross-examination into his justification defense were prejudicial. We find no merit in any of these points, and we affirm.

The appeal arises out of the shooting death of Rita Passmore and the wounding of her companion, Mark Williams. On June 3, 1994, Passmore and Williams were traveling in a black Pontiac Grand Prix on a gravel road called Scroggins Road in Independence County. They almost collided with Esmeyer, who was traveling in the opposite direction in a white Ford Tempo and who was angered by the incident. Esmeyer turned his car around and followed Passmore and Williams down Scroggins Road. According to witnesses, it was a high-speed chase. Esmeyer testified at trial that he first lost the black car, then spied it parked in a parking lot beside a Church of Christ. He pulled up beside the car and talked to Passmore, who was the driver. At that point, the stories of Esmeyer and Williams diverge. Esmeyer testified that Passmore cursed and said Esmeyer could not tell her how fast to drive, that she did not care at all about Esmeyer's grandchildren, who might be placed in jeopardy by her driving, and that he should get out of her way. According to Esmeyer, Passmore then pulled a gun, and he ducked, pulled his own .22 caliber revolver from under the seat, and came up shooting. He shot Passmore five times in the head at close range and killed her. He also wounded Williams in the back of the head. The level of alcohol in Passmore's body according to the medical exam-

iner, was consistent with the consumption of about two beers.

At trial, Williams denied that either he or Passmore had a gun but later admitted that he and Passmore had been drinking beer and smoking marijuana. After the shooting commenced, he exited his side of the car and ran first to the church and then to the home of Hazel Sharp. Williams forced his way inside the home, and Ms. Sharp called 911. She later related to police officers that the white car had been chasing Williams. She testified that she initially heard shots coming from the Church of Christ parking lot and subsequently heard three more shots as Williams was entering her house.

The following day on June 4, 1994, a composite drawing of the assailant was composed by police officers with Williams's help. The composite drawing was aired by a regional television station on the 10:00 p.m. news that same day. Esmeyer saw the telecast, and at about 12:45 a.m. the following morning, he called his first cousin, Mike McDougal, who worked for the Independence County Sheriff's Department. He asked Officer McDougal if he was looking for a white Ford Tempo, and after McDougal responded affirmatively, Esmeyer told the deputy sheriff that he owned one. Officer McDougal asked Esmeyer if he had shot anyone, and Esmeyer answered that he needed to talk to him.

Officer McDougal contacted Officer Jeff Everetts, also of the Sheriff's Department, and the two men went to Esmeyer's home. They advised Esmeyer of his *Miranda* rights and had him execute a waiver-of-rights form. Esmeyer then answered questions about the location of the gun before invoking his right to counsel. After asking for counsel, he made additional comments to the deputy sheriffs. Esmeyer was arrested and charged with capital murder and attempted capital murder. Following a jury trial, he was convicted of first-degree murder, for which he received 40 years, and attempted first-degree murder, for which he received 30 years. The trial court ran the two sentences consecutively.

### I. Tainted Jury Panel

Esmeyer's first point on appeal arises out of the jury selection. During the selection of the alternate jurors, it was brought to the trial court's attention that a potential juror, Robert Loggains, may have made inappropriate comments in the presence of other jurors. Two of Esmeyer's daughters testified that they had heard Loggains, who was being questioned as a potential alternate juror, say "[L]ook

at that killer between his two high-dollar attorneys." Loggains testified that he did not make the statement or form any opinion about the case. The trial court, nevertheless, excused Loggains for cause.

After a recess, the prosecuting attorney told the trial court that Loggains apparently made additional statements as he was leaving the courtroom. Officer Alan Cockrill of the Sixteenth Judicial District Drug Task Force testified that he heard Loggains speaking down a stairwell to one or more persons in the basement area where the jurors were located. Officer Cockrill heard Loggains state that he should have kept his mouth shut, for if he had done so, he could have "hung" Esmeyer. He also called Esmeyer a "yankee." A woman responded that Esmeyer was from the area, but Loggains answered that Esmeyer had been up North long enough to learn "their ways." Loggains also called Esmeyer a murderer.

The parties continued *voir dire* until the last alternate was seated. The trial court then asked Esmeyer's counsel if he was going to move for a mistrial based on Loggains's comments. Counsel stated that he was not seeking a mistrial at that point and expressed satisfaction with the composition of the jury.

Following that, remaining members of the *venire* were asked by the trial court whether they heard Loggains's remarks. Four members stated that they had heard various remarks from a man who fit Loggains's description. They testified that they generally ignored Loggains even though they had heard him say that he had made up his mind.

Esmeyer then moved for a mistrial on the basis that the jury was tainted. The prosecuting attorney responded that there had been extensive *voir dire* with regard to the seated jury and that the jurors had indicated that they had not heard anything when asked by the court. At that point, the trial court began questioning the jurors individually. Each juror denied hearing Loggains's comments. One alternate juror, Holly Gage, testified that she heard a man fitting Loggains's description make a racial comment that had nothing to do with the case, but she stated that what she heard would not affect her ability to serve as a juror. The trial court then announced that it was satisfied with the jury and denied the motions for declaration of a mistrial and to quash the jury. The court specifically ruled that there was not sufficient evidence, after speaking to each juror, to show that the panel was tainted.

■■ Esmeyer now contends that the trial court abused its discretion in denying the motions to quash the panel or for declaration of a mistrial. A jury, though, is presumed to be unbiased and qualified to serve, and the burden is on the appellant to show otherwise. *Cooper v. State*, 324 Ark. 135, 919 S.W.2d 205 (1996); *Franklin v. State*, 314 Ark. 329, 863 S.W.2d 268 (1993); *McFarland v. State*, 284 Ark. 533, 684 S.W.2d 233 (1985). It is for the trial court to decide whether the jurors are qualified, and that finding will not be reversed absent a showing of abuse of discretion. *Goins v. State*, 318 Ark. 689, 890 S.W.2d 602 (1995); *Cooper v. State, supra*; *Franklin v. State, supra*; *McFarland v. State, supra*. In addition, a mistrial is a drastic remedy and appropriate only when the error is beyond repair and cannot be corrected by any curative relief. *Goins v. State, supra*. The trial court has broad discretion in deciding the issue. *Id.*

■ A scenario comparable to the instant case occurred in *Goins v. State, supra*. In that case, this court declined to reverse the trial court's refusal to remove jurors for cause where the trial court had given the defendants the opportunity to explore the bias of jurors. In *Goins*, the defendants did not object to any of the jurors, and they did not identify any juror on appeal who should not have been seated. The same holds true in the case before us. Here, the trial court gave Esmeyer the opportunity to question the jurors about Loggains's comments, but he did not do so. Moreover, he did not object to any specific juror and did not give his reasons for failing to do so. Hence, no prejudice was shown, and any assertion that the jury was tainted is speculative and does not rise to the level necessary to reverse the trial court's decision.

## II. Discovery Violation

Esmeyer next contends that the prosecuting attorney violated due process and Ark. R. Crim. P. 17.1(d) by not disclosing exculpatory evidence. *See also Brady v. Maryland*, 373 U.S. 83 (1963). He specifically complains that during Officer Jeff Everetts's testimony at trial, the police officer revealed that a month or two after the shooting, he had heard that a pistol involved was hidden in an outhouse by the church. He went to investigate but found no gun. Officer Everetts admitted that he did not write about this rumor and his later search in his investigative notes. Based on this revelation, Esmeyer moved for a declaration of a mistrial at the close of the State's case due to the State's failure to notify him of the gun rumor. He complained that he had insufficient time to make an

independent search of the outhouse and, thus, was denied the opportunity to search for the most critical piece of evidence to his claim of self-defense.

The State counters that Officer Everetts testified that he searched Williams, Passmore, and their vehicle for weapons but found none. The State also points to Officer Alan Cockrill's testimony that he searched the outhouse on the day of the shooting. Officer Cockrill testified that there were cobwebs on the outhouse door but that he went ahead and looked for a gun inside the facility.

In sum, the State argues, first, that the rumored gun was not exculpatory because the grounds were searched and no gun was found. Searches transpired on the day of the shooting and also some time later. The State further emphasizes that Esmeyer knew about the rumor because during Officer McDougal's testimony, which preceded Officer Everetts's, Esmeyer's counsel asked:

> DEFENSE COUNSEL: During your investigation did you acquire any knowledge about Rita Passmore having a gun during this incident?
>
> McDOUGAL: Only hearsay, sir.
>
> DEFENSE COUNSEL: Well, did you receive information from another officer concerning Rita Passmore having a gun in the vehicle on this day in question?
>
> McDOUGAL: All I've heard to that has been strictly rumor.
>
> DEFENSE COUNSEL: Well, no, let me ask you. Did you receive this from another officer?
>
> McDOUGAL: Yes, I did.
>
> DEFENSE COUNSEL: Who was that?
>
> McDOUGAL: Officer Henderson.
>
> . . . .
>
> DEFENSE COUNSEL: As a matter of fact, did officer Henderson not tell you that he had heard it was thrown in that outhouse?
>
> McDOUGAL: Yes, sir. That's correct.

This colloquy occurred before Officer Everetts's testimony. Yet the

motion for mistrial based on the discovery violation was not made until after the conclusion of the State's case.

■■ The denial of Esmeyer's mistrial motion should be affirmed for two reasons. It is true that information held by police officers is imputed to the prosecuting attorney. *Lewis* v. *State*, 286 Ark. 372, 691 S.W.2d 864 (1985). But a failure to disclose that information will not warrant a reversal of a conviction absent a showing of prejudice. *Alford* v. *State*, 291 Ark. 243, 724 S.W.2d 151 (1987); *Snell* v. *State*, 290 Ark. 503, 721 S.W.2d 628 (1986). When the State fails to provide the information, the burden is on the appellant to show that the omission was sufficient to undermine the confidence in the outcome of the trial. *Bray* v. *State*, 322 Ark. 178, 908 S.W.2d 88 (1995). Prejudice, though, does not exist when the defendant already has access to the information that the State did not disclose. *See Johninson* v. *State*, 317 Ark. 431, 878 S.W.2d 727 (1994). That is the circumstance in the case at hand.

■ But in addition, Esmeyer did not object to the testimony by Officer McDougal in a timely manner but waited until the close of the State's case. We have held that mistrial motions must be made at first opportunity. *Turner* v. *State*, 325 Ark. 237, 926 S.W.2d 843 (1996); *Johnson* v. *State*, 325 Ark. 197, 926 S.W.2d 837 (1996). The trial court was correct in denying the motion.

### III. Miranda Violation

For his next point, Esmeyer urges that certain of his statements must be suppressed due to *Miranda* violations. At the ensuing suppression hearing, Officer McDougal testified that when he and Officer Everetts arrived at Esmeyer's house during the early morning hours of June 5, 1994, Esmeyer was informed that they were investigating the Passmore shooting, and he was read his *Miranda* rights. Esmeyer initialed and signed the waiver-of-rights form. Officer Everetts then asked if the gun was in the house, and Esmeyer responded that it was not in the residence (Statement # 1). Officer Everetts testified that when he asked Esmeyer if he knew where the gun was, he replied that he did and that he would take the police officers to it in the morning (Statement # 2).

At that time, Esmeyer requested to speak to an attorney, and questioning about the crime ceased. He was placed under arrest and taken to the Sheriff's Department. Officer Everetts testified:

[A]fter I explained that he was under arrest, he stuck his hands out to be cuffed. I asked him about his family, you know, if we needed to secure the trailer or whatever. He said that before we arrived he had done had his family leave the residence, he didn't want them there when we arrived. After we started walking out, Mr. Esmeyer made the statement I seen the picture on TV, I knew you all would be here pretty soon. [Statement # 3.]

Later, Officer McDougal testified that while they were at the Sheriff's Department, Esmeyer began asking questions about the booking procedures. Officer McDougal testified:

McDOUGAL: He asked me if I knew any good attorneys, or if I could recommend one, and I told him that I wasn't supposed to do that.

PROSECUTOR: And what did he say to you after that?

McDOUGAL: Well, he made a statement at that time that I shouldn't have done it but I don't feel sorry about it. [Statement # 4.]

McDougal further testified that Esmeyer told him after his arrest and when they were driving to the Sheriff's Department that he shot Passmore in self-defense.

The trial court ruled that Esmeyer voluntarily waived his rights for purposes of Statements #1 and #2. The court then ruled that the statements made after Esmeyer invoked his right to counsel that he "knew [they] would be coming" (Statement #3) and that he "shouldn't have done it" (Statement #4) were voluntarily made because they were not made in response to police interrogation.

■■ A defendant's waiver of his Fifth, Sixth, and Fourteenth Amendment rights must be voluntarily, knowingly, and intelligently made. *Miranda v. Arizona*, 384 U.S. 436 (1966). In order to admit into evidence an incriminating statement made pursuant to a waiver, the State must prove by a preponderance of the evidence that the waiver was made in proper fashion. *Colorado v. Connelly*, 479 U.S. 157 (1986). A valid waiver is said to be "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). A statement made while in

police custody is presumed to be involuntary. *Moore v. State*, 303 Ark. 1, 791 S.W.2d 698 (1990). In addition, the accused must have a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it in order for his waiver to be voluntary. *Moran v. Burbine, supra.*

■ In determining admissibility, this court reviews the totality of the circumstances and reverses only when the trial court's finding of voluntariness is clearly against the preponderance of the evidence. *Weaver v. State*, 305 Ark. 180, 806 S.W.2d 615 (1991); *Jackson v. State*, 284 Ark. 478, 683 S.W.2d 606 (1985). Conflicts in the testimony are for the trial court to determine and will not be reversed unless clearly erroneous. *Higgins v. State*, 317 Ark. 555, 879 S.W.2d 424 (1994). Here, Esmeyer was read his rights, and he signed the waiver-of-rights form. Officers McDougal and Everetts testified that it appeared that Esmeyer understood his rights, and that point is apparent because he later invoked his right to counsel. Considering these facts, the trial court's finding of a voluntary waiver was correct.

■ With regard to Statements #3 and #4 after Esmeyer invoked his right to counsel, the framework for analyzing their admissibility was set forth in *Edwards v. Arizona*, 451 U.S. 477, 484 (1981):

> [W]hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. . . . [A]n accused, . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself *initiates* further communication, exchanges, or conversations with the police. (Emphasis ours.)

Thus, a statement will be admissible only if the accused initiated further contact, and in doing so knowingly and intelligently waived the right he had invoked. *Franks v. State*, 306 Ark. 75, 811 S.W.2d 301 (1991); *Taylor v. State*, 303 Ark. 586, 799 S.W.2d 519 (1990). The pertinent inquiry is whether the defendant initiated the interrogating process with the police, after invoking his right to counsel.

*See Willett* v. *State*, 322 Ark. 613, 911 S.W.2d 937 (1995); *Findley* v. *State*, 300 Ark. 265, 778 S.W.2d 624 (1989).

It is clear that Esmeyer spontaneously made both Statements #3 and #4 to the police officers, and we observe no basis for reversing the trial court's ruling to allow Statements #3 and #4 into evidence under the totality-of-the-circumstances test. The record supports a conclusion that the police officers did not question Esmeyer for the purpose of soliciting these additional statements. *See Scherrer* v. *State*, 294 Ark. 287, 742 S.W.2d 884 (1988). Moreover, the fact that the trial court suppressed other statements about the gun and the gun itself as violative of *Miranda* does not render Statements #3 and #4 inadmissible. We conclude that Esmeyer's Statements #3 and #4 were voluntarily made.

## IV. Doyle Violation

For his final point, Esmeyer argues that the trial court erred in permitting the introduction of his waiver-of-rights form and by otherwise allowing the prosecuting attorney to comment on his silence during the police interrogation. We agree with the trial court that no violation occurred under *Doyle* v. *Ohio*, 426 U.S. 610 (1976).

In *Doyle* v. *Ohio, supra,* the defendants were cross-examined by the prosecutors about their post–*Miranda* silence and asked why they told an exculpatory story for the first time at trial. The Supreme Court held that this was reversible error:

> [W]hile it is true that the *Miranda* warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial.

*Doyle* v. *Ohio*, 426 U.S. at 618. *See also Thompson* v. *State*, 284 Ark. 403, 682 S.W.2d 742 (1985).

Here, the waiver-of-rights form was provided to the jury and mentioned on various occasions throughout the trial. Furthermore, during Esmeyer's cross-examination, the following colloquy occurred:

PROSECUTOR: Okay. And you didn't stay — you're here now claiming self-defense, she had a gun, and here you didn't stay, you didn't stay and say, hey, folks, Mr. Police Officer, here, that lady pulled a gun on me because that gun would be right there in the car, its right there folks. You didn't stay and give that information, did you?

ESMEYER: No sir.

. . . .

PROSECUTOR: Well, I want to get to that. But Mike McDougal, and you know that your cousin was questioned by J. R. Howard back on June 5th, don't you, and gave a complete statement, and he didn't say anything about that it was self defense then, but in regard to that, I said, I shouldn't have done it but I don't feel sorry about it. Did you say that?

ESMEYER: No, that's not exactly what I said.

This colloquy, Esmeyer contends, evidences a prosecutorial comment on his right to silence.

█ The crux of Esmeyer's argument appears to be that he waived his *Miranda* rights, and that fact was made known to the jury by the waiver-of-rights form, but then he refused to make a narrative statement. That could suggest to the jury, according to Esmeyer's theory, that he had something to hide which would violate his Fifth Amendment right against self-incrimination. We give this argument little credence for one primary reason. Esmeyer did make certain statements after being warned of his rights — Statements #1, #2, #3, and #4 — and these statements were allowed into evidence. Thus, he did talk to police after being advised of his rights, and we fail to see under these circumstances how any impingement of his right to silence occurred. Moreover, we have held that the waiver-of-rights form is relevant as corroborative evidence of the inculpatory statements made by an accused. *See Misskelley v. State*, 323 Ark. 449, 915 S.W.2d 702 (1996).

█ Furthermore, unlike the facts in *Doyle v. Ohio, supra*, Esmeyer had maintained a justification defense before trial and imparted that to Officer McDougal. According to Officer McDougal, Esmeyer told him shortly after his arrest that he shot Passmore and Williams in self-defense. Hence, Esmeyer had not been silent about his theory of the case prior to trial. Finally, the evidence of

guilt in this case was overwhelming. We observe no basis for a *Doyle* violation.

Affirmed.