John Aaron LACY *v.* STATE of Arkansas

CR 00-909 44 S.W.3d 296

Supreme Court of Arkansas
Opinion delivered May 24, 2001

*William R. Simpson, Jr.*, Public Defender, by: *Steven Abed*, Deputy Public Defender, and *Deborah R. Sallings*, Deputy Public Defender, for appellant.

*Mark Pryor*, Att'y Gen., by: *Michael C. Angel*, Ass't Att'y Gen., for appellee.

ROBERT L. BROWN, Justice. The appellant, John Aaron Lacy, was convicted of first-degree murder and sentenced to life imprisonment. He appeals and raises one point — the trial court erred in admitting his statement to a police officer into evidence. Specifically, Lacy contends that he unequivocally invoked his right to counsel and that his statement was taken in violation of *Edwards v. Arizona*, 451 U.S. 477 (1981). We hold that the trial court's finding that the statement was freely and voluntarily given after a knowing and intelligent waiver of his *Miranda* rights was not clearly erroneous.

The facts are that on October 4, 1998, Beverly Henderson was staying at the Park Lane Motel in North Little Rock with her friend, Jeff Galandt, who was a truck driver. Galandt testified that he and Henderson were engaged to be married and that Henderson had been a prostitute and suffered from a drug problem. On October 5, 1998, after leaving on his truck route and not hearing from Henderson, Galandt became concerned and called the motel manager of the Park Lane Motel, Mike Patel. Patel was busy and Galandt asked Patel's wife to have Patel check on Henderson. Patel did so and found that her motel room was in total disarray and that there was blood on the walls, carpet, and bed. He immediately notified the North Little Rock Police Department. Police officers found in their examination of the motel room that among the blood splatters was a bloody hand print on a wall.

Lacy, who was age 31 at the time, had also been staying at the Park Lane Motel on October 5, 1998, and he had been seen by another motel guest going in and out of Henderson's room that night. As part of the investigation, North Little Rock police detectives began interviewing the guests of the motel. On October 13, 1998, Lacy voluntarily came to the North Little Rock police station for an interview. All of the police interviews with Lacy on October 13, 1998, were videotaped. Prior to the interview, a police investigator took Lacy's finger prints and palm print and gave him the standard *Miranda* warnings. While the interview was underway at the police station, the State Crime Lab found that Lacy's palm print matched the palm print found on the wall of Henderson's room. Upon discovering this positive match, the police considered Lacy to be in custody.

Lacy initially denied knowing Henderson or having any knowledge of what happened in Henderson's motel room on the night in question. However, after learning of the matching palm prints, Detective Scott Armstrong, who had been asking Lacy routine questions, confronted him with the Crime Lab evidence and began interrogating him about his involvement in Henderson's murder. Lacy continued to deny any knowledge of the murder over the next two hours. Sergeant Larry Dancy then took over the interview. During this time period, Lacy invoked his right to counsel on two occasions. After visiting with his mother, Linda Tolliver, for a prolonged period of time, Lacy asked to see Sgt. Dancy. Lacy gave a statement admitting his involvement in Henderson's death, after receiving his *Miranda* warnings. He said that he had been drinking alcohol and taking cocaine at the motel and that Henderson approached him about sex. She performed oral sex on him for $20.00 in his room. After she left his motel room, he believed his wallet and a package of cocaine had been stolen. He returned to Henderson's room and accused her of the theft. They fought. According to Lacy, she pulled a gun on him and stabbed him with scissors. He hit her and strangled her until she died. With the help of a stranger, whom he paid, he transported Henderson's body to Mayflower, dragged her onto his mother's property, and buried her in a shallow grave. After giving the statement, Lacy accompanied police officers to Mayflower at about midnight and showed them where the body was buried. The following day, Lacy gave a formal statement to Detective Scott Armstrong after being given his *Miranda* warnings.

Lacy was charged with first-degree murder, and an enhancement of his sentence was requested by the prosecuting attorney owing to a criminal record of four or more felonies, with two or more of those crimes being serious crimes which involved violence.

Lacy moved to suppress his statements and the fruits of those statements and asserted that North Little Rock police detectives continued to interrogate him after he had invoked his right to counsel in violation of *Edwards v. Arizona, supra.* The trial court held a hearing where testimony was taken from the detectives and Lacy. The trial court denied the motion to suppress and found that Lacy had knowingly and voluntarily given his statement. As a result, the trial court ruled that the statements were admissible.

Over Lacy's renewed objection at trial, the audio portion of his taped statement given to Detective Armstrong on October 14, 1998, was admitted into evidence and played for the jury. The

verbal statements given by Lacy to Sgt. Dancy the previous day were not presented to the jury. Dr. Charles Kokes, a forensic pathologist with the State Crime Lab, testified that Henderson died from multiple blows to the head from a blunt force and strangulation. After the trial by jury, Lacy was found guilty of first-degree murder. Based on a finding by the trial court that Lacy had previously been convicted of rape and aggravated robbery, the trial court sentenced him to life imprisonment.

 Lacy contends on appeal that his right to counsel, as guaranteed by the Fifth Amendment and *Miranda v. Arizona*, 384 U.S. 436 (1966), was violated. We recently set out our criteria for reviewing a trial court's ruling on a motion to suppress in the cases of *Jones v. State*, 344 Ark. 682, 42 S.W.3d 536 (2001) and *Barcenas v. State*, 343 Ark. 181, 33 S.W.3d 136 (2000). In such cases, this court views the evidence in the light most favorable to the State and makes an independent determination based on the totality of the circumstances. *Barcenas v. State, supra; Stegall v. State*, 340 Ark. 184, 8 S.W.3d 538 (2000); *Humphrey v. State*, 327 Ark. 753, 940 S.W.2d 860 (1997). This court will only reverse a trial court's ruling on a motion to suppress, if the ruling was clearly erroneous. *Barcenas v. State, supra.* A statement made while an accused is in custody is presumptively involuntary, and the burden is on the State to prove, by a preponderance of the evidence, that a custodial statement was given voluntarily and was knowingly and intelligently made. *Smith v. State*, 334 Ark. 190, 974 S.W.2d 427 (1998). In order to determine whether a waiver of *Miranda* rights is voluntary, this court looks to see if the statement was the product of free and deliberate choice rather than intimidation, coercion, or deception. *Diemer v. State*, 340 Ark. 223, 9 S.W.3d 490 (2000).

██ ██ It is well settled that when an accused requests an attorney, a police interrogation must cease until counsel has been made available to him. *Edwards v. Arizona, supra.* However, if the accused initiates further communication, exchanges, or conversations with police officers, any resulting statement may be admissible. *See Edwards v. Arizona, supra; Chase v. State*, 334 Ark. 274, 973 S.W.2d 791 (1998). In *Edwards*, the United States Supreme Court concluded:

> We further hold that an accused, ..., having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.

451 U.S. at 484–485. Interrogation may take other forms than mere questioning by police officers. In *Rhode Island v. Innis*, 446 U.S. 291 (1980), the Court said:

> [T]he term "interrogation" under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter part of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police.

446 U.S. at 301.

All of the police interviews with Lacy on October 13 and October 14, 1998, were videotaped by the North Little Rock Police Department. The interviews and interrogation comprised eight hours and are depicted on six videotapes. Initially, Lacy denied any knowledge of the murder. The precise sequence of events, as shown on the videotapes, is as follows:

- On October 13, 1998, the first *Miranda* form is read to Lacy by Detective Armstrong at 2:20 p.m. and signed by Lacy. Lacy says he understands his rights "perfectly." This rights form states that Lacy was talking to police officers regarding a "missing person." The form was signed by Detective Armstrong. Detective Armstrong later tells Lacy that the Crime Lab experts have concluded that his hand prints match the prints found on the motel room wall.

- Sgt. Dancy begins speaking to Lacy approximately two hours into the interview. He points out that Lacy's arm has been scratched and repeats that the Crime Lab has matched his finger prints. Lacy tells him that he knows he's going to jail. He says he does not want to be in jail when his mother dies. He says his billfold came up missing. Lacy then asks Sgt. Dancy whether "the prosecuting attorney" can come over, and Sgt. Dancy responds that [they] can if you want to talk to one. Lacy asks whether Sgt. Dancy is going to quit talking to him if he asks to see an attorney and Sgt. Dancy says that he would. Then Lacy says "I don't want, I don't, I don't .... I want to keep talking to you. I need to talk to my mom." They discuss searching the Mayflower property

for the body. Shortly after this discussion, Sgt. Dancy tells Lacy that it is about 6:00 p.m. Lacy asks if they will go on and take him to the Pulaski County Jail, and Sgt. Dancy asks, "Why end it that way? Is that what you want?" Lacy says, "No, just tired."

- While he is being questioned, Lacy repeatedly asks to speak to his mother. His mother, Linda Tolliver, is brought to the police station by the detectives. Sgt. Dancy leaves Lacy and his mother alone in the room for a prolonged period of time. Sgt. Dancy testifies that he did not ask Ms. Tolliver to ask any questions on his behalf. After denying any knowledge of the crime for a long time, Lacy eventually tells his mother that the woman is dead. Several times during his conversation with his mother, Lacy asks his mother if she thinks he should talk to an attorney. She tells him to do whatever he wants to do.

- At some point after this, Ms. Tolliver leaves the room at the request of one of the detectives. Lt. Chapman of the North Little Rock Police Department asks Lacy if he can get him anything. Lacy responds that he wants to exercise his right to see an attorney and wants to go on to jail. At that point, Lt. Chapman stops talking to Lacy and leaves the interrogation room.

- After seven to ten minutes, Sgt. Dancy reenters the room with Ms. Tolliver, who has with her a sheet of paper which is the Crime Lab's positive match up of Lacy's hand print to the hand print at the crime scene. At Lacy's request to speak to his mother alone, Sgt. Dancy leaves the room after staying there for a little more than one minute. Ms. Tolliver tries to persuade Lacy to tell her where the body is and to admit that he accidentally killed a prostitute. She says she is concerned about a Christian burial and about kids or animals finding the body.

- While talking to his mother alone, Lacy admits that he accidentally killed Henderson but says he wants to talk to an attorney. His mother says he could have talked to an attorney any time this afternoon but emphasizes that his palm print matches the bloody palm print found in the room. Ms. Tolliver encourages Lacy to tell the police

it was an accident and that he wants to talk to an attorney. Sgt. Dancy then asks to visit with Ms. Tolliver. Ms. Tolliver returns alone, and Lacy tells her Henderson is dead and that it was an accident. Ms. Tolliver says that Lacy needs to tell Sgt. Dancy that, and Lacy says to "go get him." After talking for about 40 minutes, Ms. Tolliver leaves the room to find Sgt. Dancy to tell him that Lacy wants to talk to him. Sgt. Dancy returns to the room.

• The following conversation then transpired:

SGT. DANCY: I know that, or I'm reasonably sure. (Addressing Lacy:) Let me tell you something. If you've requested an attorney, and I don't know that you've formally done that ...

MS. TOLLIVER: No, he hasn't.

SGT. DANCY: But if you have, I'm out of here. That's the law.

LACY: Fuck the law.

MS. TOLLIVER: No, I told him ...

LACY: Ain't nobody requested anything ...

MS. TOLLIVER: He's going to tell you that this was an accident but he's still going to have to have an attorney ...

SGT. DANCY: Oh, he's going to have to have an attorney somewhere down the road ...

LACY: You going to charge me with first degree, second degree or manslaughter ...

SGT. DANCY: I don't know what I'm going to charge you with until you tell me. Look, let me tell you, if you request an attorney I'm up and out of here. That's the law.

MS. TOLLIVER: He wants to tell you ...

SGT. DANCY: I need him to tell me what happened, his side of the story and where I can find her. And because we've even talked about an attorney, I think before, if he wants to do that, before he even does that, I'd like to go over your rights [for] with you again,

because I want it to be clear as a bell. I have to protect the integrity of this investigation, number one. I have to protect your rights as a U.S. citizen, number one. I told you in here earlier, John, that I don't believe you went in this room with the intent of killing anybody.

Ms. TOLLIVER: Tell him about what happened.

SGT. DANCY: But, well, no. I think I want to go over a rights form again. I want to keep the integrity ...

Ms. TOLLIVER: No, he wants to tell you this.

LACY: Go get the rights form.

- Sgt. Dancy leaves the room and returns with the *Miranda* rights form, and this conversation ensues:

LACY: I can't talk to no attorney tonight?

SGT. DANCY: Well, yeah. You can do anything you want to, John.

LACY: Can I call an attorney now, even though I'm going to make a statement?

SGT. DANCY: Well, an attorney is going to tell you not to, but sure you can.

LACY: I'd rather do that.

Ms. TOLLIVER: John ...

LACY: I'd rather do that and still talk to you.

Ms. TOLLIVER: He wants to do both.

LACY: I want to talk to an attorney.

SGT. DANCY: They're going to tell you not to, but that's okay. Who do you want to call?

LACY: Greg Bryant.

MS. TOLLIVER: You'll have to use a public defender. I can't afford Greg Bryant.

LACY: Can you get a public defender up here?

SGT. DANCY: No. Not tonight. Not that I'm aware of.

MS. TOLLIVER: It's just what he said. He can take you and have you charged with first degree or he can take you for accidental ... manslaughter.

SGT. DANCY: I've never got a public defender up here at night. I don't know.

LACY: Could you try?

SGT. DANCY: I'll see if I can. I don't know. This is up to you John. I'm through. I'm through.

- Sgt. Dancy leaves the room. The testimony of Sgt. Dancy is that this occurred approximately five and a half hours after the interview started, but he does not give a specific time, although a rough estimate would be about 8:00 p.m. Ms. Tolliver again asks Lacy where the body is and they discuss getting an attorney and the fact it was an accident. Lacy says the body is in Mayflower.

- About twelve minutes later, Ms. Tolliver leaves the room to get Sgt. Dancy and says that Lacy wants to talk to him. Sgt. Dancy is seen reentering the room with a *Miranda* rights form. Lacy says to him immediately as he enters the room: "Yeah, I did it man." Sgt. Dancy stops him and says if Lacy wants an attorney, he is leaving. Lacy says, "Let's do it." Lacy is again read his *Miranda* rights, and Sgt. Dancy emphasizes Lacy's right to coun- sel. He signs a *Miranda* rights form at 8:15 p.m. Unlike the earlier rights form, this form states that Lacy is talk- ing to police offices about a homicide. Sgt. Dancy signs the form.

- Lacy discusses the details of the crime and the location of the victim's body on his mother's property in Mayflower. He takes the detectives to find the body in Mayflower at around midnight.

- On October 14, 1998, Detective Armstrong read Lacy his *Miranda* rights a third time, and Lacy signed another rights form at 4:38 p.m. Lacy is wearing a prisoner jumpsuit instead of the civilian clothes he was wearing in the videotapes on the previous day. He makes no request for counsel. Lacy gives a lengthy and detailed description of the murder. The interrogation ends at 7:39 p.m. The statement is audiotaped and played for the jury at trial.

■ Under the test enunciated by the Supreme Court in *Edwards v. Arizona, supra,* the critical inquiry for this court is whether Lacy initiated further communication with the police detectives, before making his statement to Sgt. Dancy. We believe that Lacy did. There is no question in our minds that Lacy was fully aware of his *Miranda* rights and specifically of his right to counsel. Indeed, he had invoked that right once with Lt. Chapman, who immediately left the room, and a second time with Sgt. Dancy, who said: "I'm through. I'm through." Yet Lacy continued to massage the issue with his mother and asked her repeatedly whether he should talk to an attorney. Her ultimate advice was to tell the police detectives that Henderson's death was an accident and where the body was buried and then talk to an attorney. This is the advice that Lacy chose to follow.

Lacy would now have it that after he asked for an attorney, no later statement by him would be admissible. That is not the law. The Supreme Court in *Edwards v. Arizona, supra,* makes it clear that an accused may *initiate* contact with the police even after asking for an attorney. And that is precisely what happened in the case at hand. Lacy told his mother to go get Sgt. Dancy, and when the police sergeant entered the room, Lacy said, "Yeah, I did it man." Sgt. Dancy stopped him and went over his *Miranda* rights again and in doing so, underscored his right to an attorney several times. Lacy executed the *Miranda* rights waiver form and proceeded to tell his story.

Caselaw in Arkansas and other jurisdictions support our conclusion. In 1994, this court affirmed a trial court's ruling to allow a suspect's statement into evidence after that suspect (Rockett) had asked for counsel. *See Rockett v. State,* 318 Ark. 831, 890 S.W.2d 235 (1994), overruled in part on other grounds *Mackintrush v. State,* 334 Ark. 390, 978 S.W.2d 293 (1998). In that case, Rockett was arrested for murder, and he requested counsel. Subsequently, he initiated contact with the police, waived his *Miranda* rights, and gave a statement. We stated that on appeal, we looked to the totality of the

circumstances and view the evidence in the light most favorable to the State. We then concluded:

> Here, we hold the record supports the trial court's ruling admitting Rockett's statement. Detective Smiley testified that Jazmar Kennedy, Rockett's girlfriend, came to the jail to visit Rockett. Smiley admitted that he told Ms. Kennedy that maybe if Rockett showed some remorse the jury might give him life instead of the death penalty. After visiting with Rockett, Ms. Kennedy told Detective Smiley that Rockett wanted to talk to him. Although Detective Smiley knew that Rockett had an attorney at this point, he agreed to hear what Rockett had to say. He introduced himself to Rockett and asked if he had wanted to talk. Rockett responded in the affirmative. The two went to another room, and before Smiley said anything, Rockett said that he did not mean to kill the clerk and began to tell the whole story. Detective Smiley interrupted, Rockett's rights were read and a *Miranda* form was completed, and Rockett gave a complete confession of the events at the Stax store. Both Rockett and his girlfriend denied that Rockett requested to speak to Smiley. However, it is for the trial court to decide questions of credibility and conflicts in testimony, and we will not reverse unless the decision is clearly erroneous. *Everett v. State*, 316 Ark. 213, 871 S.W.2d 568 (1994). Having reviewed the record, we are satisfied that the trial court's decision was not clearly erroneous, and we affirm.

318 Ark. at 838, 890 S.W.2d at 238–239. The events in *Rockett* resemble what occurred in the instant case.

■ This court has affirmed other trial court rulings where statements were admitted into evidence after a suspect had first sought counsel. *See, e.g., Stephens v. State*, 328 Ark. 81, 941 S.W.2d 411 (1997); *Esmeyer v. State*, 325 Ark. 491, 930 S.W.2d 302 (1996). In *Stephens*, we observed that in cases when the right to counsel is invoked but then waived, the proper focus is on whether the subsequent waiver of the right to counsel is intelligently and voluntarily made. Other states are in agreement with this principle. *See, e.g., People v. Woolley*, 178 Ill.2d 175, 687 N.E.2d 979 (1997); *State v. Flack*, 260 Mont. 181, 860 P.2d 89 (1993); *State v. Claybrook*, 736 S.W.2d 95 (Tenn. 1987).

■ We hold that Lacy initiated contact with Sgt. Dancy after invoking his right to counsel and that the trial court did not clearly err in finding that he knowingly and intelligently waived his *Miranda* rights at that time.

Lacy also argues that his mother, in effect, became an agent of the North Little Rock Police Department or at least a "go-between." This, he contends, was utilization of the functional equivalent of the police to obtain a statement in violation of *Rhode Island v. Innis, supra*. We disagree. First and foremost, it was Lacy who repeatedly asked for his mother to be present. Based on the videotapes, Lacy had enormous confidence in his mother's advice and asked her multiple times whether he should talk to an attorney. We have no doubt that Ms. Tolliver had her son's best interests at heart, and her repeated advice to him was to tell the police that Henderson's death was an accident, which is what Lacy ultimately did. We see nothing wrong in the police allowing Ms. Tolliver to continue to talk with her son. We note that after Lacy exercised his right to counsel with Lt. Chapman, Ms. Tolliver reentered the room with Sgt. Dancy, and Lacy dismissed Sgt. Dancy. He then visited with his mother at length. Again, that is analogous to what happened in *Rockett v. State, supra*.

Other jurisdictions have not seen fit to deny admission of a statement when a family member or friend has encouraged the suspect to talk after the suspect has invoked his or her right to counsel. *See, e.g., Arizona v. Mauro*, 481 U.S. 520 (1987) (suspect invoked right to counsel in murder of his son and wife asked to speak to suspect with police present with a tape recorder; Court upheld admissibility of statements which were used to show suspect was sane on grounds this was not police-initiated interrogation and that suspect was not subjected to compelling influences, psychological ploys, or direct questioning by police officers); *Snethen v. Nix*, 885 F.2d 456 (8th Cir. 1989) (suspect declined to speak to police without attorney present, but mother asked to speak to suspect who made incriminating statements in front of police; statement admissible since no evidence police questioned suspect; petition for writ of *habeas corpus* denied); *U.S. ex rel. Whitehead v. Page*, 2000 W.L. 343209 (N.D. Ill. 2000) (friend convinced suspect to confess to murder after he requested counsel; no evidence this was police-initiated interrogation; petition for *habeas corpus* denied); *Lowe v. State*, 650 So.2d 969 (Fla. 1995) (suspect confessed to girlfriend that he murdered victim after requesting counsel; police told girlfriend evidence against suspect; court affirmed admission of statement, holding no violation of *Rhode Island v. Innis, supra*); *Cook v. State*, 270 Ga. 820, 514 S.E.2d 657 (1999) (court upheld confession to murders given to suspect's father, an FBI agent, after suspect requested an attorney; court held father was not directed by law enforcement to obtain confession).

In the instant case, Lacy had been aware for hours that the Crime Lab had matched his palm print to the one on the motel wall. This means the evidence that his mother brought into the interrogation room was nothing new to him. Further, it was Lacy who wanted to consult with his mother and seek her advice. The fact is crystal clear from a viewing of the videotapes. That this ultimately inured to the benefit of police officers does not convert Ms. Tolliver into the Department's agent or functional equivalent, and Sgt. Dancy was adamant that Ms. Tolliver was not acting at the direction of the police department.

Lacy urges that *Hughes v. State*, 289 Ark. 522, 712 S.W.2d 308 (1986), is authority for reversing this case. That is not our view. In *Hughes*, the suspect confessed to murder to an employee of the prosecutor's office who continued to question the suspect after she invoked her right to counsel. We held that the questioning should have stopped and invalidated the confession. The instant case is vastly different. Here, Lacy's mother, whom he wanted to see, discussed the case with him and then Lacy initiated contact with the police.

■ The totality of the circumstances in the instant case supports a holding that Ms. Tolliver's involvement did not run afoul of *Rhode Island v. Innis, supra*.

There is one additional point. The only statement of Lacy that was played for the jury was the statement given to Detective Armstrong the day following the interrogation by Sgt. Dancy. Detective Armstrong took the formal statement after advising Lacy, once again, of his *Miranda* rights. Lacy waived those rights in writing and proceeded to give his statement. No request for counsel was made. Accordingly, there was no hint of a *Miranda* violation when Lacy gave his formal statement to Detective Armstrong. Because the parties do not argue the point of whether what transpired the next day cured any alleged *Miranda* violations, we do not address it.

The record has been examined pursuant to Ark. Sup. Ct. R. 4-3(h) for other reversible error, and none has been found.

Affirmed.

IMBER and THORNTON, JJ., dissent.

ANNABELLE CLINTON IMBER, Justice, dissenting. I must dissent. Mr. Lacy clearly invoked his right to the assistance of

counsel during interrogation when he informed. Lt. Chapman that he wished to assert his right to counsel. Lt. Chapman responded appropriately and left Mr. Lacy alone. A few minutes later, however, Sgt. Dancy returned to the interrogation room in the company of Mr. Lacy's mother, Ms. Tolliver. It is this encounter, which the majority merely glosses over, that forces me to dissent from the decision reached by the court today.

When a suspect in custody is subjected to interrogation, the suspect must be informed of his right to counsel and his right to remain silent. *Miranda v. Arizona*, 384 U.S. 436 (1966). If at any time during the custodial interrogation, the suspect unambiguously invokes his right to counsel, all interrogation must immediately cease and may not be resumed, absent a break in custody. *Edwards v. Arizona*, 451 U.S. 477 (1981); *McNeil v. Wisconsin*, 501 U.S. 171 (1991). Once the suspect has invoked his right to counsel, law enforcement officers may not resume the interrogation unless it is the suspect who initiates the exchange. *Edwards v. Arizona, supra.*

In the instant case, Mr. Lacy clearly and unambiguously invoked his right to counsel when he engaged in the following exchange with Lt. Chapman:

> MR. LACY: Y'all have just sat up here all this time, catering to me. My mom's out there about to stroke out, *but I'm just ready to go on to jail.* I know y'all are going to get pissed.
>
> LIEUTENANT: We aren't going to be upset about it, but it's like I told you earlier, our main concern is trying to at least get her to where she goes to a proper place.
>
> MR. LACY: *It's best I go on to jail.* I feel like I've wasted y'all's time. I heard my mom out there getting upset.
>
> LIEUTENANT: No, I just saw your mom. She's fine.
>
> MR. LACY: I can say this about your detectives. They're professional. *I will go on and exercise my right to see an attorney. I'm ready to go on to jail.*
>
> LIEUTENANT: Okay.

(Emphasis added.) At that point, Lt. Chapman acted appropriately and ceased his discussion with Mr. Lacy. After a few minutes, however, Sgt. Dancy returned to the interrogation room with Mr.

Lacy's mother. Upon entering the room, Ms. Tolliver confronted Mr. Lacy with evidence of a bloody palm print belonging to Mr. Lacy that had been recovered from the room in which Ms. Henderson died. Sgt. Dancy provided Ms. Tolliver with the evidence. The following exchange then occurred:

> MS. TOLLIVER: John Aaron, now I want you to see what they've got here and I want you to tell me . . . . This is the bloody print that was on the wall, and will you read what this says? Did you accidentally do this? Son, if you accidentally did it, then if you accidentally did this, son, you need to be honest.

> (Sgt. Dancy then speaks to Ms. Tolliver, telling her what he has told Mr. Lacy.)

> MS. TOLLIVER: If this woman is laying dead in the woods or someplace, would you want Blake (?) and Morgan to walk up on her?

> MR. LACY: No.

> MS. TOLLIVER: If this lady is laying dead someplace, she needs to be tended to.

> (Ms. Tolliver begins to cry and Mr. Lacy asks Sgt. Dancy if he would allow Mr. Lacy to speak with Ms. Tolliver.)

> MS. TOLLIVER: Son, I'm OK. Listen to me. Listen to me. It's just hard for Mama to absorb everything, okay? But if this lady's laying dead someplace, it's the Christian thing to do to see to it she's tended to before some little kid or an animal finds her.

> (Mr. Lacy again asks Sgt. Dancy to allow him to speak with his mother. At this point, someone from outside the room interrupts to tell Sgt. Dancy that the captain wants to talk to him. Before he leaves the room, Sgt. Dancy addresses Mr. Lacy with the following comment.)

> SGT. DANCY: *John, I'm not trying to hurt you, man. I'm trying to be honest with you.*

> MR. LACY: I know.

(Emphasis added.)

Following this encounter, Mr. Lacy continued talking with his mother for several minutes and then eventually agreed to speak with Sgt. Dancy again. The constitutional infirmity arises because it was Sgt. Dancy, not Mr. Lacy, who reinitiated the interrogation process during the above encounter. Mr. Lacy had been sitting alone in the room after telling Lt. Chapman that he wanted to see an attorney. Sgt. Dancy[1] reentered the room with Ms. Tolliver and observed as she attempted to convince her son to make a confession about where Ms. Henderson's body could be found. Had Sgt. Dancy's involvement been limited to observation, there would be no constitutional violation. *Arizona v. Mauro*, 481 U.S. 520 (1987). However, Sgt. Dancy was not merely a casual observer. As noted above, Sgt. Dancy provided evidence to Ms. Tolliver to bolster her persuasive efforts. He then interrupted Ms. Tolliver's persistent demands for information to tell her what he had already told Mr. Lacy in his own attempts to persuade him to confess. Finally, when his captain called him from the room, Sgt. Dancy turned directly to Mr. Lacy and said "I'm not trying to hurt you, man. I'm trying to be honest with you." By interjecting this statement into the conversation, Sgt. Dancy was clearly attempting to persuade Mr. Lacy to reveal incriminating information. The fact that the comment was not a direct question is irrelevant. An interrogation occurs when an officer uses any words or actions that the officer should know are reasonably likely to elicit an incriminating response from the suspect. *Rhode Island v. Innis*, 446 U.S. 291 (1980). There was no conceivable purpose for Sgt. Dancy's comment other than to elicit an incriminating response from Mr. Lacy. While Sgt. Dancy made the statement as he was leaving the room, he was nevertheless aware that Mr. Lacy's conversation with his mother was not only being observed by other officers, but it was also being recorded on videotape. Furthermore, Sgt. Dancy was aware that Ms. Tolliver was firmly and persistently demanding that Mr. Lacy tell her where Ms. Henderson was buried.

The majority today glosses over this encounter with Sgt. Dancy, claiming that Mr. Lacy dismissed Sgt. Dancy from the room and that, when Sgt. Dancy returned, Mr. Lacy waived his right to counsel. The fact is that Mr. Lacy asked Sgt. Dancy twice to be allowed to speak privately with his mother; but, it was not until the sergeant was called from the room by a superior officer that he

---

[1] The record is silent as to whether Lt. Chapman informed Sgt. Dancy of Mr. Lacy's request for counsel. Sgt. Dancy is charged with having knowledge of any assertion of the right to counsel, regardless of whether he had actual knowledge. *Arizona v. Roberson*, 486 U.S. 675, 687 (1988).

actually left Mr. Lacy alone with his mother. Even then, Sgt. Dancy knew that Mr. Lacy's interaction with his mother was being observed and recorded.

After several more minutes of persuasive efforts by Ms. Tolliver, Mr. Lacy finally acquiesced to his mother's insistence that he tell Sgt. Dancy where to find Ms. Henderson's body. At this point, Mr. Lacy denied having requested counsel and Sgt. Dancy re-*mirandized* him. However, it was too late. Sgt. Dancy had unconstitutionally reinitiated the interrogation of Mr. Lacy when he entered the room with Ms. Tolliver and actively aided her in her persuasive efforts following Mr. Lacy's unequivocal assertion of his right to counsel. "[W]hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated interrogation even if he has been advised of his rights." *Edwards v. Arizona*, 451 U.S. at 484. Once an accused has "expressed his desire to deal with the police only through counsel," he is "not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Id.* at 484–85.

The purpose of the *Edwards* rule is to protect a suspect's desire to deal with the police only through counsel. *McNeil v. Wisconsin, supra.* It is "designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights," *Minnick v. Mississippi*, 498 U.S. 146, 150 (1990); *Michigan v. Harvey*, 494 U.S. 344 (1990); *McNeil v. Wisconsin, supra.* The suspect's right to counsel cannot be adequately protected where the suspect is subject to "persistent attempts by officials to persuade him to waive his rights," as Mr. Lacy was in the instant case. *Minnick v. Mississippi*, 498 U.S. at 153. The prophylactic rule requiring the suppression of any statement made following police-initiated interrogation of a suspect who has asserted his right to counsel "ensures that any statement made in subsequent interrogation is not the result of coercive pressures." *Minnick v. Mississippi*, 498 U.S. at 151.

To effectuate the above-stated purpose, the *Edwards* decision created a bright-line rule of suppression because it must be presumed that any subsequent waiver of the previously asserted right to counsel that comes at the behest of law enforcement, rather than the suspect's own initiation, is the product of the "inherently compelling pressures" of custodial interrogation rather than the "purely voluntary choice of the suspect." *Arizona v. Roberson*, 486 U.S. 675,

681 (1988) (quoting *Miranda v. Arizona, supra*). "The merit of the *Edwards* decision lies in the clarity of its command and the certainty of its application." *Minnick v. Mississippi*, 498 U.S. at 151. Its "clear and unequivocal" rule, like its predecessor *Miranda v. Arizona*, "has the virtue of informing police and prosecutors with specificity as to what they may do in conducting custodial interrogation, and of informing courts under what circumstances statements obtained during such interrogation are not admissible." *Minnick v. Mississippi*, 498 U.S. at 151. "Surely there is nothing ambiguous about the requirement that after a person in custody has expressed his desire to deal with the police only through counsel, he 'is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.' " *Arizona v. Roberson*, 486 U.S. at 681 (quoting *Edwards v. Arizona, supra*).

The case before us today is precisely the situation the *Edwards* court sought to prevent. Mr. Lacy unequivocally invoked his right to counsel. Interrogation was then reinitiated by Sgt. Dancy. Sgt. Dancy's persuasion, combined with the extensive persuasive efforts of Ms. Tolliver, ultimately led to Sgt. Dancy's desired result—Mr. Lacy waived his previously asserted right to counsel. But, even then, Mr. Lacy attempted to reassert that right. The following exchange occurred when Sgt. Dancy began filling out a rights form.

> MR. LACY: (*to his mother*) You don't want me to talk to an attorney first?
>
> MS. TOLLIVER: John, I don't know. I've never been involved in this. *But he said he wants to help you.*
>
> MR. LACY: *I can't talk to no attorney tonight?*
>
> SGT. DANCY: Well, yeah. You can do anything you want to, John.
>
> MR. LACY: *I'd rather do that.*
>
> MS. TOLLIVER: John . . .
>
> MR. LACY: I'd rather do that and still talk to you.
>
> MS. TOLLIVER: He wants to do both.
>
> MR. LACY: *I want to talk to an attorney.*

SGT. DANCY: *They're going to tell you not to,* but that's okay. *Who do you want to call?*

MR. LACY: *Greg Bryant.*

MS. TOLLIVER: You'll have to use a public defender. I can't afford Greg Bryant.

MR. LACY: *Can you get a public defender up here?*

SGT. DANCY: *No. Not tonight.* Not that I'm aware of.

MS. TOLLIVER: It's just what he said. He can take you and have you charged with first degree or he can take you for accidental ... manslaughter.

SGT. DANCY: *I've never got a public defender up here at night. I don't know.*

MR. LACY: *Could you try?*

SGT. DANCY: I'll see if I can. I don't know. This is up to you John. I'm through. I'm through.

(Emphasis added.)

Following this exchange, Sgt. Dancy left the room again, ceasing the interrogation as he is required to do. There is no evidence that the State ever attempted to contact either Greg Bryant, whom Mr. Lacy requested by name, or the public defender's office, whom Mr. Lacy resorted to upon being informed that he could not have Mr. Bryant. Finally, after eight hours of interrogation, having been informed that he could not have the counsel he clearly and unequivocally requested on multiple occasions, Mr. Lacy confessed to the murder of Ms. Henderson without the assistance of counsel.

The majority holds that Mr. Lacy voluntarily waived his right to counsel; but, that is not the deciding issue in this case. A determination of voluntariness must certainly be made when a suspect has waived his right to counsel, but that determination is not made until after it is proven that the suspect initiated the dialogue with the police. *Oregon v. Bradshaw,* 462 U.S. 1039 (1983). The issue before us today is whether Mr. Lacy initiated the contact that ultimately led to his waiver of the right to counsel and his confession. To this question, the clear and unmistakable answer is no. Mr.

Lacy asked for counsel repeatedly. A suspect's request for counsel during interrogation indicates that he does not "feel sufficiently comfortable with the pressures of custodial interrogation to answer questions without an attorney. This discomfort is precisely the state of mind that *Edwards* presumes to persist unless the suspect himself initiates further conversation about the investigation." *Arizona v. Roberson*, 486 U.S. at 684. Mr. Lacy finally surrendered to the pressures of custodial interrogation and waived his previously invoked right to counsel. This ultimate waiver of his right to counsel is not surprising considering that Mr. Lacy had not been provided with the attorney he had already requested. *See Arizona v. Roberson*, 486 U.S. at 686 n.6. As a result of the officers' failure to honor Mr. Lacy's request for counsel and Sgt. Dancy's initiation of interrogation in violation of the "clear and unequivocal" *Edwards* rule, Mr. Lacy's statement should have been suppressed. For the above-stated reasons, I would reverse and remand.

It should be noted that the suppression of Mr. Lacy's confession would not leave the State without recourse upon the retrial of Mr. Lacy. Before he invoked his right to counsel and Sgt. Dancy reinitiated the interrogation, Mr. Lacy made highly incriminating statements to Ms. Tolliver. Specifically, he told his mother that he knew Ms. Henderson was dead and that she was buried in Mayflower.[2] In addition, the State has physical evidence linking Mr. Lacy to the crime. Thus, there is ample evidence available to the State upon retrial.[3]

THORNTON, J., joins in this dissent.

---

[2] As a result of these statements by Mr. Lacy, Ms. Henderson's body eventually would have been recovered from its burial site on Ms. Tolliver's property at Mayflower. "[W]hen, as here, the evidence in question would inevitably have been discovered without reference to the police error or misconduct, there is no nexus sufficient to provide a taint and the evidence is admissible." *Nix v. Williams*, 467 U.S. 431, 448 (1984).

[3] The postscript at the end of the majority opinion can only be characterized as unsolicited dicta. It is certainly difficult to fathom why the majority hints at "one additional point" and then declines to address it because neither of the parties argue the point.