Larry LADWIG *v.* STATE of Arkansas

CR 96-1432                                    943 S.W.2d 571

Supreme Court of Arkansas
Opinion delivered April 28, 1997

*Bynum & Kizer*, by: *Maxie G. Kizer*, for appellant.

*Winston Bryant*, Att'y Gen., by: *Kelly Terry*, Asst. Att'y Gen., for appellee.

DAVID NEWBERN, Justice. Larry Ladwig was charged with capital murder in connection with the death of Rakaan Ellsworth, the fifteen-month-old son of Mr. Ladwig's wife, Stephanie Ellsworth. He was convicted of first-degree murder as that crime is described in Ark. Code Ann. § 5-10-102(a)(3) (Repl. 1993), and sentenced to imprisonment for forty years. On appeal, Mr. Ladwig contends his motion for a directed verdict should have been granted because the State failed to prove that he, in the terminology of the statute, "knowingly caused the death of a person fourteen years of age or younger." We hold that Mr. Ladwig's testimony is sufficient to support the jury's determination that his actions resulting in the child's death were done "knowingly." Mr. Ladwig's other point concerns an alleged error in the sentencing procedure, but as it was not raised at the trial, we decline to consider it. The conviction is affirmed.

## 1. Sufficiency of the evidence

The evidence demonstrated that on the morning of August 31, 1995, Mr. Ladwig was at home with the child. Rakaan's mother fed Rakaan and left for work before 7:00 a.m. At a few minutes after 8:00 a.m. she received a telephone call from Mr. Ladwig. He told her that Rakaan was making "funny noises" and would not wake up.

Ms. Ellsworth rushed home to find Rakaan in his crib with his eyes dilated and unblinking. They took Rakaan to Jefferson Regional Hospital in Pine Bluff. Rakaan did not respond to any of the treatment administered at the Hospital, so he was airlifted to the Arkansas Children's Hospital in Little Rock. Rakaan did not regain consciousness. He was pronounced brain dead and removed from life support equipment. He died on September 1, 1995.

When Rakaan was being treated at Jefferson Regional Hospital, the doctors noticed several bruises on his body and a large knot on his forehead. They determined that the bruises, the severe swelling of his head, and his other injuries were evidence of child abuse. Police detectives questioned Ms. Ellsworth and Mr. Ladwig at the Hospital.

Mr. Ladwig went to the police station. He was advised of his rights and signed a waiver at 10:07 a.m. He then gave the first of three statements. In the first statement he said that the knot on Rakaan's forehead was the result of a fall which occurred on the playground. He also claimed that he fell on Rakaan causing him to hit his head on the side of the swimming pool on the evening of August 30. According to the first statement, when he checked on Rakaan at about 7:35 that morning, he discovered that Rakaan had not finished his bottle. Mr. Ladwig told the officers that he could not awaken Rakaan, changed Rakaan's clothes, and then began to shake him to wake him up. He called Ms. Ellsworth because Rakaan remained unresponsive.

Later, Mr. Ladwig admitted that he had not been entirely truthful and agreed to give a second statement. In that statement he confessed that the bruises on Rakaan's legs were probably caused by his squeezing the child's leg too hard. He explained the child's bruised stomach by saying that on the day before Rakaan's hospitalization, "He wouldn't be quiet and stuff, so I would lay him down and I would slap him with my hand open on his stomach and I'd do that four or five times, and I don't know, I just kept doing it."

When questioned about the knot on the victim's forehead, Mr. Ladwig said, "He was doing the same thing, and blew up and stuff and I pushed him from behind and [he] fell forward and hit his head on the door." Mr. Ladwig told investigators that he bruised Rakaan's ears by squeezing them and shaking the victim on two or three occasions. Although denying that he picked the child up by the ears, he said, "I picked him up and had my hands on his ears and was shaking him and I probably squeezed too hard." That occurred "in the last couple of days." Mr. Ladwig also admitted that in the same time period he "probably hit [Rakaan] up side the head once or twice" in an effort to quiet him.

When questioned about his activities on that morning, Mr. Ladwig continued to claim that he shook the child only in an effort to wake him. The police arrested Mr. Ladwig after this statement was concluded.

Mr. Ladwig gave a third statement on September 3, 1995. In this statement, he said that he panicked when he could not awaken Rakaan and that he placed his hands on the child's shoulders and shook him in his crib. He admitted that, at the time, he felt like his previous actions had caused the child's unconsciousness.

When questioned about the knot on the back of Rakaan's head, he said:

> The only thing I can think of is when I was shaking him in the crib he hit the, hit the crib, or I hit him on the top of the crib or something when I was shaking him, or something. . . . I don't know. I mean he might have hit his head and he probably did, because I had him right by the top and it was shaking and his head was going back and forth, and that's probably where he hit his head. . . . I probably shook him for more than ten minutes. . . . I was shaking him more than a little bit.

Mr. Ladwig also admitted that he knew that slapping a child could hurt him, and that he had heard that a child could be injured if shaken. In regard to shaking a baby, Mr. Ladwig said:

> You shake them so much that it, I mean you can do damage to their head. . . . You could kill, probably kill them, or serious, you know, seriously give them head damage or something. I don't know if that's — I don't know a whole lot about it, but I know you probably could kill them if you shook them or something.

At trial, the State introduced all three of the statements given by Mr. Ladwig. The State also produced testimony from Dr. Erickson, an associate medical examiner at the Arkansas State Crime Laboratory. He told the jury that the cause of death was craniocerebral trauma.

■ A motion for directed verdict is a challenge to the sufficiency of the evidence. *Stewart v. State*, 320 Ark. 75, 894 S.W.2d 930 (1995); *Evans v. State*, 317 Ark. 449, 878 S.W.2d 409 (1994); *Glick v. State*, 275 Ark. 34, 627 S.W.2d 14 (1982). The test for determining the sufficiency of the evidence is whether the verdict is supported by substantial evidence, direct or circumstantial. *Evans v. State, supra*; *Thomas v. State*, 312 Ark. 158, 847 S.W.2d 695 (1993). Substantial evidence is evidence that is of sufficient

certainty and precision to compel a conclusion one way or another. *Evans v. State, supra*; *Coleman v. State*, 314 Ark. 143, 860 S.W.2d 747, (1993). In determining whether substantial evidence exists, the Court reviews the evidence in the light most favorable to the appellee. *Id*.

According to Ark. Code Ann. § 5-2-202 (Repl. 1993), "A person acts knowingly with respect to a result of his conduct when he is aware that it is practically certain that his conduct will cause such a result."

■ The evidence was sufficient to show that Mr. Ladwig struck and shook the child knowing that the result could be serious injury or death. The motion for directed verdict was properly denied.

## 2. Sentencing

When the jury could not agree on sentencing, the Trial Court scheduled a hearing to render a sentence as is permitted by Ark. Code Ann. § 5-4-103(b) (Repl. 1993). At that hearing, the Trial Court told Mr. Ladwig that he would depart upward from the presumptive sentence stated in the statutory sentencing guidelines, as permitted by Ark. Code Ann. § 16-90-804 (Supp. 1995), and stated as the justification, required by Ark. Code Ann. § 16-90-804(a)(2)(A) (Supp. 1995), the following:

> Principally because the Court finds, as did the jury, that your conduct was cruel and the victim in this matter was a small, vulnerable child. Secondly the Court is well aware that the jury in your case was deadlocked on the sentence to recommend to this Court. Eleven jurors were in favor of 40 years. One juror was holding out for life.

The Trial Court stated that there was "no good reason to deviate from the collective wisdom and judgment of the eleven jurors" who sentenced Mr. Ladwig to forty years imprisonment.

Mr. Ladwig argues, for the first time on appeal, that the Trial Court erred in its upward departure from the sentencing grid. He claims, without referring to any direct evidence, that the Trial Court had an *ex parte* communication with the jury, and that the

Trial Court failed to use his discretion when he sentenced him in accordance with the wishes of a majority of the jurors.

■    We will not consider an argument contesting the sentence if the appellant, even though present during the sentencing phase, failed to voice to the Trial Court his objection to the sentence. *Whitney v. State*, 326 Ark. 206, 930 S.W.2d 343 (1996); *Reece v. State*, 325 Ark. 465, 928 S.W.2d 334 (1996). A defendant who makes no objection at the time sentence is imposed has no standing to complain of it. *Williams v. State*, 303 Ark. 193, 794 S.W.2d 618 (1990); *McGee v. State*, 271 Ark. 611, 609 S.W.2d 73 (1980).

Affirmed.