Steven A. STEGGALL *v.* STATE of Arkansas

CR 99-712                                    8 S.W.3d 538

Supreme Court of Arkansas
Opinion delivered January 20, 2000

*Val P. Price* and *Scott Nance*; and *Terry Goodwin Jones*, Law Student Admitted to Practice Pursuant to Rule XV(E)(1)(6) of Rules Governing Admission to the Bar of the Arkansas Supreme Court; for appellant.

*Mark Pryor*, Att'y Gen., by: *Brad Newman*, Ass't Att'y Gen., for appellee.

LAVENSKI R. SMITH, Justice. Appellant Steven A. Steggall appeals his capital-murder conviction for the death of his three-month-old daughter, Haylee Brianne Stice ("Haylee"), who died of traumatic injuries to her head and body. The trial court sentenced Steggall to life in prison. Hence, we have jurisdiction under Ark. Sup. Ct. R. 1-2(a)(2). On appeal, Steggall argues that the prosecution adduced insufficient facts to support a capital-murder conviction, and that his statements to the police should have been suppressed because he requested that an attorney be present during the statements. We find no error and affirm.

### Facts

On April 2, 1998, Steggall and Misty Stice ("Stice"), Haylee's mother, admitted Haylee to the emergency room of a Newport hospital. Steggall initially told investigators he had called 911 after

observing bleeding from the child's nose after he laid her down to sleep. Haylee was transported by helicopter shortly thereafter to Arkansas Children's Hospital in Little Rock, where she was first seen by Dr. Stephen Schexnayder, a pediatric critical-care and emergency-medicines physician. Dr. Schexnayder testified at trial that upon initial evaluation, he and his team found Haylee to be "a very severely ill child who was in shock." According to Dr. Schexnayder, she was "severely neurologically injured, meaning she was comatose."

Dr. Charles Albert James, a pediatric radiologist, conducted several diagnostic tests including a skeletal survey or full-body x-ray, a CT scan of Haylee's brain, and a bone scan to identify bone abnormalities. Dr. Schexnayder and Dr. James reviewed the test results. Both doctors noted that Haylee had suffered an "extensive skull fracture" on the right side of her head, resulting in hemorrhaging on the brain surface and damage to both frontal lobes of the brain. The x-rays and bone scan also revealed that Haylee suffered two occurrences of rib fractures — one occurrence approximately two weeks before this hospital admission and the other related to the April 2 occurrence. The tests also revealed that Haylee had suffered a fractured forearm, which was healing, indicating that it was over a week old at the time of admission on April 2. Both doctors opined that the old and new injuries were consistent with child abuse. Specifically, they believed the injuries reflected "shaken baby syndrome" and "shake and slam syndrome." Children's Hospital reported the incident to the Jackson County Sheriff's Department as suspected child abuse.

Steggall made three statements to the police regarding the incident on April 2, 1998. The police first questioned Steggall on the evening of April 3, 1998, at Arkansas Children's Hospital. Chief Deputy David Lucas and Detective Charles Vaughn with the Jackson County Sheriff's Department conducted the interview, which was audiotaped. Prior to conducting the interview, Lucas had Steggall answer and initial a standard *Miranda* rights form. The statement was later transcribed. In this first statement, Steggall recounted the events of the night before. He stated that he laid Haylee down in her bed on her stomach and finished some housecleaning. He stated he heard a choking sound, went to check on Haylee, and noticed when he rolled Haylee over on her side that some blood came out of her nose. Steggall stated that when he picked her up she was

limp, and he then called 911. Throughout this statement, Steggall denied ever shaking or dropping Haylee.

Steggall again met with the police investigators on the morning of April 8, 1998. State Police Investigator Charles Beall orally advised Steggall of his rights before taking the statement, and Steggall completed a standard *Miranda* waiver form provided by the police. Steggall indicated that he understood his rights and would waive them. Steggall dictated a statement to Beall which Beall transcribed by hand. In the handwritten statement, Steggall recounted that while he was feeding Haylee by bottle, she began spitting up and formula was coming out of her nose. Haylee vomited, and when she did, her head somehow fell upside down. Steggall stated:

> When I noticed that Haylee's head was upside down I grabbed her by her leg and jerked her up by her leg with my left hand. Haylee's head went down and popped. When I cleaned her up she started crying. I then a little while later started bouncing her on my knee probably too fast for Haylee. Her head was bouncing around.

Steggall said he noticed blood coming out of Haylee's nose about five to ten minutes later after he laid her in her bed. It was at that time that he and Stice called 911. Steggall also reported for the first time that Haylee's head had hit the front of the wood portion of a couch when he jerked her up by her leg, and that he "might have squeezed Haylee by her ribs too hard."

Lucas and Beall interviewed Steggall for the third time on April 9, 1998, at the Arkansas State Police headquarters in Little Rock. The officers used a standard *Miranda* form to advise Steggall of his rights before beginning the interview. Steggall, as previously, initialed and signed the form, indicating that he understood his rights and was willing to speak with the officers without counsel. The police videotaped the interview, made an audio tape, and later transcribed it. In that statement, Steggall generally recounted the events of April 2, 1998, again as he had stated in his April 8, 1998, written statement.

On April 14, 1998, the Jackson County prosecuting attorney charged Steggall by Information with battery in the first degree under Ark. Code Ann. § 5-13-201. Haylee died on May 3, 1998, from complications associated with her injuries. On May 5, 1998,

the prosecutor amended the Information filed against Steggall to state a charge of capital murder. The Jackson County Circuit Court tried Steggall on December 8, 1998. At the close of the State's evidence, the defense moved for a directed verdict, arguing that there was insufficient evidence to support a finding that Steggall acted "knowingly" as required under Ark. Code Ann. §§ 5-10-101 and 5-2-202. Instead, the defense argued that only circumstantial evidence existed and that this is not enough if any other reasonable conclusion exists. Here, the defense argued, the evidence could support a finding that Steggall acted recklessly. The court denied this motion, noting that the defendant's state of mind was an issue for the jury. The jury convicted Steggall of capital murder and sentenced him to life in prison. He filed a timely Notice of Appeal on December 18, 1998.

As noted, Steggall raises two points on appeal. First, Steggall argues that the trial court erred when it denied his motion for directed verdict because there was insufficient evidence to support a capital-murder conviction. Second, Steggall argues that the trial court erred in failing to suppress Steggall's three statements to police because Steggall contends that he requested an attorney during the interrogations.

### Sufficiency of the evidence

When an appellant challenges the sufficiency of the evidence, we address the issue prior to all others. *Byrd v. State*, 337 Ark. 413, 992 S.W.2d 759 (1999). A directed-verdict motion is a challenge to the sufficiency of the evidence. *McDole v. State*, 339 Ark. 391, 6 S.W.3d 74 (1999); *Ayers v. State*, 334 Ark. 258, 975 S.W.2d 88 (1998). The test for determining sufficiency of the evidence is whether there is substantial evidence to support the verdict. On appeal,when a defendant challenges the sufficiency of the evidence convicting him, the evidence is viewed in the light most favorable to the State. *Windsor v. State*, 338 Ark. 649, 1 S.W.3d 20 (1999); *Dixon v. State*, 310 Ark. 460, 839 S.W.2d 173 (1992). Evidence is substantial if it is of sufficient force and character to compel reasonable minds to reach a conclusion and pass beyond suspicion and conjecture. *Ladwig v. State*, 328 Ark. 241, 943 S.W.2d 571 (1997). Only evidence supporting the verdict will be considered. *Hendrickson v. State*, 316 Ark. 182, 871 S.W.2d 362 (1994).

This court makes no distinction between circumstantial and direct evidence when reviewing for sufficiency of the evidence. However, for circumstantial evidence to be sufficient, it must exclude every other reasonable hypothesis consistent with innocence. Whether the evidence excludes every hypothesis is left to the jury to determine. *Williams v. State*, 338 Ark. 97, 991 S.W.2d 565 (1999). Guilt may be proved in the absence of eyewitness testimony, and evidence of guilt is not less because it is circumstantial. *Trimble v. State*, 316 Ark. 161, 871 S.W.2d 562 (1994). A criminal defendant's intent or state of mind is rarely capable of proof by direct evidence and must usually be inferred from the circumstances of the crime. *Byrd, supra; Green v. State*, 330 Ark. 458, 956 S.W.2d 849 (1997).

In his directed-verdict motion, Steggall argued that this case is based on circumstantial evidence alone; therefore, if any other conclusions can be drawn from that evidence, besides that of "knowingly" causing injuries as defined by the statute, then the capital-murder sentence is not warranted. Ark. Code Ann. § 5-10-101(a)(9) (Repl. 1997), the capital-murder statute, states:

> (a) A person commits capital murder if:

> (9) Under circumstances manifesting extreme indifference to the value of human life, he knowingly causes the death of a person fourteen (14) years of age or younger at the time the murder was committed, provided that the defendant was eighteen (18) years of age or older at the time the murder was committed.

Ark. Code Ann. § 5-2-202 on culpable mental states defines "knowingly" as follows:

> (2) "KNOWINGLY." A person acts knowingly with respect to his conduct or the attendant circumstances when he is aware that his conduct is of the nature or that such circumstances exist. A person acts knowingly with respect to a result of his conduct when he is aware that it is practically certain that his conduct will cause such a result.

According to Ark. Code Ann. § 5-2-202 (Repl. 1993): "A person acts knowingly with respect to a result of his conduct when he is aware that it is practically certain that his conduct will cause such a result." A jury need not lay aside its common sense in evaluating the ordinary affairs of life, and it may infer a defendant's guilt from improbable explanations of incriminating conduct. *See e.g., Goff v.*

*State*, 329 Ark. 513, 953 S.W.2d 38 (1997); *Davis v. State*, 325 Ark. 96, 925 S.W.2d 768 (1996).

In *Byrd*, we dealt with "shaken baby syndrome" in a case in which a seven-month-old boy died after suffering a blunt-force trauma causing a skull fracture and brain swelling. The child in *Byrd* had suffered repeated episodes of abuse as evidenced by his medical history, including evidence of multiple healing rib fractures and a leg fracture. In that case, the defendant argued, as Steggall does now, that only circumstantial evidence existed and, as such, a finding of "knowingly" could not be established to support a capital-murder conviction. We especially noted that the medical evidence indicated that the injuries occurred during the time that the defendant was caring for the child, and that the injuries presented "uncontroverted evidence of child maltreatment." The court in *Ladwig* also came to the same conclusion in that "shaken baby syndrome" case, finding that the defendant struck and shook the child, knowing that the result would be serious injury or death.

Here, the evidence before the jury certainly provided them with ample evidence, circumstantial and direct, to find Steggall acted "knowingly" in causing the child's death. At trial, both Dr. Schexnayder and Dr. James testified about their opinions regarding the source of Haylee's injuries. Dr. James stated that the type of rib injuries Haylee sustained are not generally seen in accidental trauma. He stated:

> This site of bone injury is felt to be highly, highly specific for child abuse because we don't see this fracture in this location hardly ever in other forms of trauma, bad car wreck, bad fall, resuscitation. This site of bone injury is felt to be highly, highly specific that there was intentional trauma to the infant, which is what we term child abuse or non-accidental trauma.

He further stated:

> We know from the images now that we have severe force has (*sic*) been applied, traumatic force has been applied to the infant. We know from being able to age both on the head scan the hemorrhage, the blood, and the healing changes of bone, we have severe traumatic force applied to this child over different time periods, over different organ systems, the brain, the bones scattered throughout the body.

Dr. Schexnayder testified that "given the whole picture of some of the findings I've yet to get to, this is consistent with multiple repetitive injuries that were not accidentally inflicted. In other words, this child was abused." In response to a question regarding whether these findings are consistent with "shaken baby syndrome," Dr. Schexnayder responded that the skull fracture was actually part of a related syndrome called "shake and slam syndrome." Dr. Schexnayder stated:

> To get this skull fracture, the child had to have a high force impact with some solid object, be it, you know, a table, a fist, a wall, but the child not only had to be shaken but the child had to have some severe impact to the point that it caused a very large skull fracture.

The doctor summarized, stating:

> The bleeding in the eyes, the bleeding over the top of the brain, the rib fractures at the back, at the back part of the ribs that were fresh, those are consistent all with shaking. The old rib fractures are consistent with this child being shaken but at a different time, as is that healing rib fracture on the right, but to get that fresh skull fracture on the right, the child had to have a severe impact with something.

The State also offered the testimony of Dr. Charles Paul Kokes, who performed an autopsy on Haylee's body on May 4, 1998. Dr. Kokes, a specialist in the fields of anatomic and forensic pathology, testified regarding his findings from the autopsy, noting that Haylee suffered an "eleven centimeter long healing skull fracture which extended from the right front part of the skull back over the right side of the skull." Dr. Kokes also noted the subdural hematoma that Haylee's treating physicians saw on the CT scan. Dr. Kokes testified that he saw evidence of healing rib fractures on both sides of the chest wall and on four ribs. While Dr. Kokes did not see evidence of the arm or leg fractures, he attributed this to the time that had elapsed, over one month, from the time the injuries occurred to the time he performed the autopsy. Dr. Kokes testified that the injuries Haylee sustained were a result of "a blunt force trauma," which could consist of the child either being struck very forcibly or compressed in some manner. In Dr. Kokes's medical opinion, the cause of Haylee's death was the head injuries with complications, and the manner of death was due to homicide. Dr. Kokes stated:

[I]f you consider in the context of a child with that sort of head trauma, older injuries sufficiently severe enough in different anatomic locations in that same individual at a different time, that simply means that this child was the victim of repetitive physical abuse, had been abused before the time she sustained the head injuries. In that context that makes the likelihood that the injuries were not accidental in nature very strong, and it's not (sic) likely even under those circumstances without consideration of other factors, that this death is in all likelihood a homicide.

Dr. Kokes further noted in his autopsy report, which was admitted into evidence at trial, the following:

Healing fractures of the ribs and left radius are important in this case, not because they had adversely affected the infant, but because of what they say about the circumstances surrounding the traumatic incident. The initial story regarding what happened to this infant on April 2, 1998 is totally inconsistent with the clinical and pathologic findings. Subsequent statements given by the father, which admit some relatively mild head injuries took place, are also inconsistent with the findings. Mechanisms described by the father could not have caused the degree of head damage that was present. Nor does it explain the presence of healing rib fractures and a left wrist fracture at the time of the presentation to the hospital on April 2, 1998. The presence of healing fractures at that time indicates that this child was a victim of repetitive abuse. The head injuries which occurred on April 2, 1998 were the final injuries in a series of incidents which were sustained in this infant's short life.

In addition to Steggall's statements to the police, he also made a fourth statement to Dr. John R. Anderson, Ph.D., a staff psychologist at the Arkansas State Hospital, during a mental examination to determine whether Steggall was competent to stand trial and whether he was competent at the time of the April 2, 1998, incident to understand and conform his actions. Before the examination, Dr. Anderson advised Steggall that the statements he made during the interview would not be privileged. During the examination, when asked about the events of April 2, Stegall first denied he did anything to Haylee, but then recanted and said that she had been injured while he was feeding her. Dr. Anderson quoted Steggall as saying, "I dropped my daughter, I got frustrated and I shook my daughter." He further stated, "I tried to keep her from hitting the floor, and she hit the couch. When I realized what happened, I

got mad at myself." He also stated, "I realized what I had done and I laid her down in her crib."

█ █ As the State notes, the appellant's attorney conceded on closing arguments that Steggall had shaken Haylee to death. Steggall's attorney argued, however, that he did not "knowingly" shake her to death. However, Steggall's own conduct in giving different versions of the incidents of April 2, 1998, defy this assertion. A criminal defendant's intent or state of mind is seldom capable of proof by direct evidence and must usually be inferred from the circumstances of the crime. *Thompson v. State*, 338 Ark. 564, 999 S.W.2d 192 (1999); *Mulkey v. State*, 330 Ark. 113, 952 S.W.2d 149 (1997); *Williams v. State*, 325 Ark. 432, 930 S.W.2d 297 (1996). In *Thompson*, the verdict was based on circumstantial evidence, but the evidence excluded any other hypothesis consistent with innocence. Thompson's attempts to cover up his connection to the crime were before the jury, and the jury could have properly considered evidence of cover-up as proof of a purposeful mental state. *See also, Brenk v. State*, 311 Ark. 579, 847 S.W.2d 1 (1993); *Mulkey, supra.* Circumstantial evidence of a culpable mental state may constitute substantial evidence to sustain a guilty verdict. *Williams, supra; Crawford v. State*, 309 Ark. 54, 827 S.W.2d 134 (1992). Here, there was ample evidence for the jury to find that Steggall knowingly caused the death of the infant. Therefore, denial of the directed-verdict motion was proper, and the court was correct in allowing the jury to consider the evidence.

*Suppression Motion*

Prior to the start of trial, the defense moved for suppression of Steggall's three statements, arguing that Steggall believed he was coerced and was not given the right to counsel. At the suppression hearing, the State presented testimony by the investigating officers regarding the circumstances surrounding the taking of Steggall's statements. Each officer testified that Steggall orally and in writing waived his rights, and voluntarily agreed to speak to the police regarding the case. The officers testified that Steggall did not seem to be under the influence of any drugs or alcohol, and that he seemed to understand the protections he was waiving. Furthermore, the officers testified that Steggall did not request the presence of an attorney at any time prior to, during, or after making the

statements to them. Steggall testified at the suppression hearing that he was advised of his rights at each of the three meetings with the police, and that he voluntarily waived his rights. However, Steggall stated that at the second meeting in Little Rock, he asked for an attorney twice, but that the officers seemed like they "wanted to get it done and over with." Steggall could not remember exactly what they said, but he stated that he "felt pressure" from the officers. Steggall also testified that he would have requested an attorney at the third meeting on April 9 had he known that he was being videotaped. The trial court denied the motion to suppress the statements at trial.

In his second point on appeal, Steggall argues that the trial court erred in denying his motion to suppress the statements he made to police regarding the events of April 2, 1998. Specifically, Steggall argues that he asked for an attorney when he was questioned by the police on April 8, 1998, and when videotaped on April 9, 1998, and that their failure to stop the questioning and allow him the opportunity to speak to counsel rendered those statements inadmissable. The State responds by arguing that the issue before the trial court was essentially one of credibility, and that the appellate court defers to the trial judge in such matters. Here, the trial judge believed the three police officers and the various recorded statements and videotape to determine that the statements should be admitted at trial.

When we review a trial court's ruling on a motion to suppress, we review the evidence in the light most favorable to the State and make an independent determination based upon the totality of the circumstances. *Bangs v. State*, 338 Ark. 515, 998 S.W.2d 738 (1999); *Wright v. State*, 335 Ark. 395, 983 S.W.2d 397 (1998). Further, this court will only reverse a trial court's ruling on a motion to suppress if the ruling was clearly erroneous. *Phillips v. State*, 321 Ark. 160, 900 S.W.2d 526 (1995).

Although Steggall argues that he requested the presence of an attorney, it is undisputed that he signed *Miranda* waiver forms notifying him of his right to counsel and, apparently on three occasions, gave the police statements without exercising those rights. In fact, as the State notes, the only evidence that Steggall presents that he asked for an attorney is his own testimony. This issue then turned on credibility, and it is in the province of the

finder of fact to determine the credibility of witnesses. *Bryant v. State*, 314 Ark. 130, 862 S.W.2d 215 (1993); *Atkins v. State*, 310 Ark. 295, 836 S.W.2d 367 (1992).

The burden is on the State to show that a defendant's confession was made after a voluntary, knowing, and intelligent waiver of his rights. *Rushing v. State*, 338 Ark. 277, 992 S.W.2d 789 (1999); *Cagle v. State*, 267 Ark. 1145, 594 S.W.2d 573 (1980). As was the case in *Cagle*, appellant's confession was given without counsel. The test is whether appellant was effectively warned of his rights and knowingly and willingly decided to waive them. *Id.* (citing *United States v. Harden*, 480 F.2d 649 (8th Cir. 1973)). The assertion of the right to counsel and the right to remain silent must be made with specificity. *Bowen v. State*, 322 Ark. 483, 911 S.W.2d 555 (1995) (citing *Davis v. United States*, 512 U.S. 452 (1994)).

In *Clay v. State*, 318 Ark. 122, 883 S.W.2d 822 (1994), this court noted that there are two separate issues regarding the waiver of Miranda rights:

> Only if the 'totality of the circumstances surrounding the interrogation' reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Id.* (citing *Moran v. Burbine*, 475 U.S. 412 (1986)). The court in *Clay* further noted that the "totality of the circumstances" review mandated an inquiry into an evaluation of

> age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights. A court must look at the totality of the circumstances to see if the State proved that a defendant had the requisite level of comprehension to waive his Fifth and Sixth Amendment rights.

Here, Steggall was read his rights on three occasions, and he indicated on each occasion that he understood those rights. In fact, Steggall was audio- and videotaped on two out of three of these occasions, and there is no indication in the transcripts of these statements that he requested an attorney during the questioning. Considering Steggall's age, education, and experience, no special circumstances existed to invalidate his waiver. He was an adult who

had graduated high school and had completed some college credits. During these interviews, he showed no signs of being under the influence of any drug or delusions. Steggall also had prior experience with law enforcement as a child and teenager, as indicated in the psychological report generated in this case, and was placed on probation for shoplifting and stealing a truck. In his prior marriage, Steggall also had a run-in with law enforcement for alleged child abuse perpetrated against his stepdaughter. While those charges were dropped, he did deal with the police in that instance, as well. Based upon the foregoing, we conclude the trial court was not clearly erroneous in denying Steggall's Motion to Suppress. Accordingly, the judgment of the trial court is affirmed.

*Rule 4-3(h)*

In compliance with ark. Sup. Ct. R. 4-3(h), the record has been examined for all objections, motions, and requests made by either party that were decided adversely to appellant, and no error has been found.

Affirmed.