SLIP OPINION

Cite as 2016 Ark. App. 225

# ARKANSAS COURT OF APPEALS

DIVISION III
No. CR-15-769

| | |
|---|---|
| PAUL MARTIN SUCHEY<br>APPELLANT | Opinion Delivered April 27, 2016 |
| V. | APPEAL FROM THE CRAIGHEAD COUNTY CIRCUIT COURT, WESTERN DISTRICT<br>[NO. CR-2013-1109] |
| STATE OF ARKANSAS<br>APPELLEE | HONORABLE BRENT DAVIS, JUDGE |
| | AFFIRMED |

## BART F. VIRDEN, Judge

A Craighead County jury convicted appellant Paul Suchey of first-degree battery of his then three-month-old son, L.S. Suchey argues that the trial court erred in denying his motions for directed verdict. We affirm.

### I.  *Standard of Review*

A directed-verdict motion is a challenge to the sufficiency of the evidence. *Steggall v. State*, 340 Ark. 184, 8 S.W.3d 538 (2000). The test for determining sufficiency of the evidence is whether there is substantial evidence to support the verdict. *Id*. Evidence is substantial if it is of sufficient force and character to compel reasonable minds to reach a conclusion and pass beyond suspicion and conjecture. *Id*. On appeal, the evidence is viewed in the light most favorable to the State, and only evidence supporting the verdict will be considered. *Id*. This court makes no distinction between circumstantial and direct evidence

when reviewing for sufficiency of the evidence; however, for circumstantial evidence to be sufficient, it must exclude every other reasonable hypothesis consistent with innocence. *Id*. Whether the evidence excludes every hypothesis is left to the jury to determine. *Id*. Guilt may be proved in the absence of eyewitness testimony, and evidence of guilt is not less because it is circumstantial. *Id*. The credibility of a witness's testimony is for the jury to assess—and it may believe all, part, or none of a witness's testimony. *Wheeler v. State*, 2014 Ark. App. 281. The jury is also tasked with resolving conflicting testimony and any inconsistent evidence. *Id*.

## II.  *Trial Testimony*

Britney Hockett was living with Suchey, who is now her ex–husband, and their infant son, L.S., at her parents' home. Because Suchey was disabled, he cared for L.S. while Hockett worked at two jobs. On the morning of September 2, 2013, Hockett was scheduled to work from 9:30 a.m. to 5:00 p.m. Hockett said that, when she awoke around 7:30 a.m., L.S. was "his normal self" and that she left for work around 8:30 a.m. Her parents, who were getting a nearby house ready to sell, left that morning around 10:30 a.m. Hockett's mother, Debbie, said that she thought that L.S. seemed "fine" when she returned briefly around 2:00 p.m. for drinks. According to Hockett's sister, Dana Johnson, L.S. was "very happy and giggling" when she saw him around 2:00 p.m. Debbie came home again around 4:00 p.m. to prepare supper by putting a roast in the crockpot, and she left shortly afterwards.

When Hockett arrived home around 6:20 p.m., Suchey told her that a barking dog had wakened L.S. from his nap, which caused him to become "fussy." Hockett could not

2

comfort the baby, who continued to cry. When Johnson stopped by around 7:00 p.m., L.S. was crying and moaning, and Johnson offered to hold him. Unlike Hockett, Johnson held the baby such that the right side of his head was not pressed against her arm, and L.S. calmed down. It was then that Johnson commented that L.S.'s head seemed "deformed." On closer inspection, Johnson said that it looked as though L.S. had "an egg-shaped tumor" on the right side of his head.

Hockett drove L.S. to the hospital by herself, as Suchey had insisted on following them in his own vehicle. Hockett testified that she and her family were crying and "all panicked" but that Suchey sat playing a game on his phone. Hockett testified that she was told by the doctor that L.S. had one of the worst skull fractures that he had seen and that it looked like L.S. had been struck in the head with a baseball bat. Debbie recalled that, when the doctor was speaking, Suchey never looked at him or at L.S. Debbie testified that she asked Suchey whether he had done something to the baby and that Suchey only looked at her but said nothing.

Joe Robinson, a patrolman with the Jonesboro Police Department, was dispatched to the hospital with a report of possible child abuse. Robinson said that he could not get much information from Hockett and the grandmother because they were crying. Suchey, on the other hand, did not show much emotion. Suchey first told Robinson that he did not know what had happened to the baby. He then said that, while he was bouncing the baby on his knees, the baby slipped and hit his head on Suchey's knee. Next, Suchey said that, as he was carrying the baby down the hallway, his legs just "gave out," he lost his balance, and the

baby's head hit a doorframe. Robinson said that Suchey quickly changed the subject to his disability. Sergeant Brad Rossman, who was also with the Jonesboro Police Department, testified that he had been informed by doctors that L.S.'s injury was caused by blunt force trauma and that he told Suchey that the baby could not have been hurt in the manners he had described to Robinson. According to Rossman, Suchey said, "That's my story[,] and I'm sticking to it."

Dr. Mickey Deal, an emergency-room physician at St. Bernard's Medical Center in Jonesboro, described feeling fluid and moving bones when he touched L.S.'s head and diagnosed a depressed skull fracture. Dr. Deal stated that the parietal plates in an infant's skull are not easy to break and that a break results from a substantial impact. He further stated that such injuries were generally caused by being struck with objects like a hammer, a baseball bat, or steel-toed boots. Dr. Deal said that skull fractures like L.S.'s are potentially life-threatening and that surgery is generally considered. Dr. Deal determined that L.S. needed to see a neurosurgeon immediately, so the baby was airlifted to Memphis.

Dr. Karen Lankin, a physician at Le Bonheur Children's Hospital in Memphis and assistant professor of pediatrics at the University of Tennessee, testified that a 3–D CT image of L.S.'s head showed a large crack all the way across his skull, separation, and some depression, which she diagnosed as a complex skull fracture. Dr. Lankin stated that it took a lot of concentrated force to cause that injury. Dr. Lankin said that such fractures are caused by significant blows to the head resulting from, for example, car accidents, a fall from a balcony, and being struck with a baseball bat, a hammer, or a brick. According to Dr.

Lankin, L.S. also suffered subdural bleeding, the pain from which she described as "the worst headache" one could ever have. She further stated that the subdural bleeding in connection with the complex fracture was "a very serious injury" and that such trauma to a three-month-old infant is "certainly life threatening." When asked how such trauma could threaten a baby's life, Dr. Lankin said that any major impact or trauma to the brain that results in a fracture is "a significant injury," which increased the risk for complications that may not be apparent until later in life. Dr. Lankin noted that treating infants can be difficult because they cannot say what happened, how much the injury hurts, and how long the pain lasts.

A jury convicted Suchey of first-degree battery, a Class Y felony, and he was sentenced to thirty-five years' imprisonment.

### III.  *First-Degree Battery*

A person commits battery in the first degree if the person knowingly causes serious physical injury to any person four years of age or younger under circumstances manifesting extreme indifference to the value of human life. Ark. Code Ann. § 5-13-201(a)(9) (Repl. 2013). Battery in the first degree is a Class Y felony under the circumstances described in subdivision (a)(9) of this section. Ark. Code Ann. § 5-13-201(c)(2).

### IV.  *Argument*

Suchey argues that there was insufficient evidence that L.S.'s injury created a substantial risk of death and that there was no evidence that L.S. suffered protracted disfigurement or impairment. He further asserts that the State failed to prove that he acted knowingly because there was no direct evidence of his mental state and that there was no

SLIP OPINION



evidence that he acted with extreme indifference to the value of human life.

## V. *Discussion*

### A. Serious Physical Injury

"Serious physical injury" means physical injury that creates a substantial risk of death or that causes protracted disfigurement, protracted impairment of health, or loss or protracted impairment of the function of any bodily member or organ. Ark. Code Ann. § 5-1-102(21) (Repl. 2013). Whether a victim has sustained serious physical injury is an issue for the jury to decide. *Bangs v. State*, 338 Ark. 515, 998 S.W.2d 738 (1999). The fact that the victim ultimately recovers has no bearing on whether the injury sustained is serious. *Williamson v. State*, 2011 Ark. App. 73, 381 S.W.3d 134.

Dr. Deal felt fluid and moving bone fragments when he touched L.S.'s head and described the skull fracture as one of the worst he had seen in an infant. He said that such fractures were potentially life threatening. Dr. Deal was concerned enough to have the baby airlifted to Memphis to consult with a neurosurgeon. At Le Bonheur, L.S. underwent additional testing and received pain medication. Dr. Lankin testified that subdural bleeding could cause the worst headache one could ever suffer. Dr. Lankin specifically testified that L.S.'s injury was very serious and "certainly life threatening." Dr. Lankin said that any major trauma to the brain that results in a fracture is a significant injury. The swelling of the right side of the baby's head lasted several days, and Dr. Lankin said that the injury placed L.S. at greater risk of developing complications "down the road." The jury could conclude from this evidence that L.S. sustained a serious physical injury.

SLIP OPINION



### B. Mental State

A person acts knowingly with respect to a result of the person's conduct when he is aware that it is practically certain that his conduct will cause the result. Ark. Code Ann. § 5-2-202(2)(B) (Repl. 2013). Because of the difficulty in ascertaining a defendant's intent or state of mind, a presumption exists that a person intends the natural and probable consequences of his acts. *DeShazer v. State*, 94 Ark. App. 363, 230 S.W.3d 285 (2006). The phrase "under circumstances manifesting extreme indifference to the value of human life" is part of the proof of the actor's mental state. *McCoy v. State*, 347 Ark. 913, 69 S.W.3d 430 (2002). First-degree battery "involves actions which create at least some risk of death which, therefore, evidence a mental state on the part of the accused to engage in some life-threatening activity against the victim." *Estacuy v. State*, 94 Ark. App. 183, 186, 228 S.W.3d 567, 570 (2006) (citing *Jones v. State*, 282 Ark. 56, 665 S.W.2d 876 (1984)). A criminal defendant's intent or state of mind is rarely capable of proof by direct evidence and must usually be inferred from the circumstances of the crime. *Steggall*, *supra*. A fact-finder may consider and give weight to any false, improbable, and contradictory statements made by the defendant to explain suspicious circumstances. *Williamson*, *supra*. Also, a fact-finder need not lay aside its common sense in evaluating the ordinary affairs of life. *Id*.

L.S. was in Suchey's care, and there was a time frame of approximately two hours within which Suchey was alone with the baby. Immediately following that period, Hockett arrived home from work and could not soothe her crying baby, who had developed a "deformed" head. There was evidence that, when Hockett decided to take L.S. to the

hospital, Suchey packed a bag for himself and insisted on driving his own vehicle to the hospital. The experts testified that it took a significant blow to cause L.S.'s complex skull fracture. While Suchey initially claimed that nothing had happened to have caused the baby's injury, he then offered two improbable explanations for how the baby's skull had been fractured. The jury could properly consider Suchey's demeanor during the crisis. While Hockett and her family cried, Suchey played a video game and did not look up when the doctor said that it looked as though L.S. had been hit in the head with a baseball bat. Suchey also could not look at his son when the doctor gave this impression concerning the cause of the injury. The jury could infer from these circumstances that Suchey acted knowingly and with extreme indifference to the value of human life.

VI.   *Conclusion*

We hold that there is substantial evidence to support Suchey's conviction for first–degree battery and, thus, affirm.

Affirmed.

HIXSON and BROWN, JJ., agree.

*Thomas W. Haynes*, for appellant.

*Leslie Rutledge*, Att'y Gen., by: *Rachel Kemp*, Ass't Att'y Gen., for appellee.