Cite as 2019 Ark. App. 378

# ARKANSAS COURT OF APPEALS

DIVISION II
№ CR-18-1061

| | |
|---|---|
| JOSHUA DULLE | **Opinion Delivered:** September 18, 2019 |
| APPELLANT | |
| | APPEAL FROM THE BOONE COUNTY CIRCUIT COURT [NO. 05CR-16-188] |
| V. | |
| | HONORABLE GORDON WEBB, JUDGE |
| STATE OF ARKANSAS | |
| APPELLEE | AFFIRMED |

## RAYMOND R. ABRAMSON, Judge

A Boone County Circuit Court jury convicted appellant Joshua Dulle of second-degree murder and sentenced him to sixteen years in the Arkansas Department of Correction. On appeal, Dulle challenges the sufficiency of the evidence supporting his conviction. For the following reasons, we affirm.

On February 20, 2016, six-month-old Miles Dunaway was rushed to the North Arkansas Regional Medical Center emergency room in critical condition caused by a severe neurological injury. Miles was flown to Arkansas Children's Hospital in Little Rock where he died from his injuries the following day. At 4:50 a.m. on February 20, Miles's mother, Alexis Dunaway, had dropped Miles off with his babysitters, Joshua Dulle and his girlfriend, Kimberly McCoy. Dulle babysat Miles because he believed he was the child's

father. McCoy and Dulle had their two biological children living in their home when they were watching Miles.

Dunaway recalled nothing was unusual with Miles when she dropped him off with McCoy and Dulle. McCoy gave him a bottle and changed his diaper and left for work about 8:30 that morning. McCoy told Dulle to bathe Miles because he was sweaty. Dulle was the lone adult with Miles for approximately forty-five minutes before finding Miles unresponsive and not breathing. He later told officers three different versions of what unfolded.

Dulle stated that Miles was "active in the water" during the shower, and afterward, he left Miles alone in the room between two and five minutes. When Dulle returned, Miles was either not moving or was moving only his legs according to contradictory statements made by Dulle. However, all of the versions of his story included that Miles's eyes were rolled back in his head. Medical records indicated that Miles had been found unresponsive and not breathing on a previous occasion.[1] At that time, he was diagnosed with laryngomalacia, a condition that can cause difficulty breathing; his mother reported continued breathing problems after that.

At one point, Dulle told officers that he shook Miles a number of times and may have "tapped" him on the face. He also pulled his bib off his neck and claimed to have tripped over a baby gate and fallen to the floor while trying to seek help. When officers

---

[1]This occurred when Miles was approximately two months old and in the care of his grandparents.

arrived, Miles had no pupil response and required placement of an endotracheal tube for breathing. Multiple responders noted a red line across his neck and bruising on the left side of his jaw and on the other side of his face. Miles was transported to a local hospital and then flown to Arkansas Children's Hospital.

From his arrival at the local hospital to the time his death was declared, Miles remained a three on the Glasgow Coma Scale, the same as a deceased person. This is because he had no eye-opening response, no motor function, and no verbal response. Miles's numerous brain injuries included a subarachnoid hemorrhage, an intraventricular hemorrhage, and swelling of the brain, which caused the sutures of his skull to separate. He had diffused retinal hemorrhages in both eyes, and one of the exams found a macular fold in the left eye. The autopsy showed that the ligature mark across the neck was a "deep-seated contusion" and that Miles had a bruise on the back of his neck.

Dulle was charged with capital murder and convicted of second-degree murder. At trial, Dulle moved for a directed verdict on the charge of capital murder as well as the lesser- included offenses of murder in the first degree, murder in the second degree, manslaughter, and negligent homicide. The circuit court denied the motion as to each offense. Dulle renewed his motion at the conclusion of all the evidence; it was again denied. After being convicted of second-degree murder, Dulle again challenged the sufficiency of the evidence in a posttrial motion to set aside the verdict. It was deemed denied by the circuit court's inaction. This timely appeal is now properly before our court.

Our standard of review for a sufficiency challenge is well settled. We treat a motion for directed verdict as a challenge to the sufficiency of the evidence. *Price v. State*, 2010 Ark. App. 111, at 8, 377 S.W.3d 324, 330. In reviewing a challenge to the sufficiency of the evidence, we view the evidence in the light most favorable to the State and consider only the evidence that supports the verdict. *Id.*, 377 S.W.3d at 330–31. We affirm a conviction if substantial evidence exists to support it. *Id.*, 377 S.W.3d at 331.

The test for determining the sufficiency of the evidence is whether the verdict is supported by substantial evidence, direct or circumstantial. *Snow v. State*, 2018 Ark. App. 612, at 5, 568 S.W.3d 290, 293. Substantial evidence is that which is of sufficient force and character that it will, with reasonable certainty, compel a conclusion one way or the other without resorting to speculation or conjecture. *Price, supra*. Circumstantial evidence may constitute substantial evidence to support a conviction only if it excludes every other reasonable hypothesis other than the guilt of the accused, and the jury is charged with making this determination. *Snow, supra.*

The weight of the evidence and the credibility of the witnesses are matters for the fact-finder, not for this court on appeal. *Ridling v. State*, 360 Ark. 424, 203 S.W.3d 63 (2005). The jury may believe all or part of any witness's testimony and is responsible for resolving questions of conflicting testimony and inconsistent evidence. *Satterfield v. State*, 2014 Ark. App. 633, 448 S.W.3d 211. This is true even of opinion testimony offered by experts. *E.g., Marcyniuk v. State*, 2010 Ark. 257, at 8, 373 S.W.3d 243, 250. A person's intent or state of mind is rarely capable of proof by direct evidence and most often is

4

inferred from the circumstances of the crime. *E.g.*, *Steggall v. State*, 340 Ark. 184, 190, 8 S.W.3d 538, 542 (2000). A jury is not required to lay aside common sense and may infer guilt from improbable explanations of incriminating conduct. *See, e.g.*, *Davis v. State*, 325 Ark. 96, 924 S.W.2d 768 (1996).

A person commits second-degree murder if "[t]he person knowingly causes the death of another person under circumstances manifesting extreme indifference to the value of human life[.]" Ark. Code Ann. § 5-10-103(a)(1) (Repl. 2013). Knowingly is defined as a "person's conduct or the attendant circumstances when he or she is aware that his or her conduct is of that nature or that the attendant circumstances exist"; or "[a] result of the person's conduct when he or she is aware that it is practically certain that his or her conduct will cause the result[.]" Ark. Code Ann. § 5-2-202(2)(A) & (B) (Repl. 2013). For instance, a person acts knowingly with respect to the result when he strikes and shakes a child to death. *See Steggall*, 340 Ark. at 190–94, 8 S.W.3d at 543–45 (holding that defendant acted knowingly based on medical evidence of brain bleeding, bleeding in the eyes, fractures, and older injuries of the child that could not be explained by accidental trauma, but were explained by shaking and slamming the child).

Circumstances manifesting extreme indifference to the value of human life require "deliberate conduct that culminates in the death of another person." *Price v. State*, 373 Ark. 435, 439, 284 S.W.3d 462, 465–66 (2008). This necessitates actions on the part of the person that evidence a mental state, and the intent required is the "intent to engage in the

5

conduct that ultimately culminates in the death of a person, and not the intent to cause the death of a person." *Id.* at 441, 284 S.W.3d at 467.

With these standards in mind, we turn to the case before us to determine if the evidence at trial was sufficient to establish Dulle's second-degree-murder conviction. Miles died as a result of abusive head trauma that was the result of rapid force and violent shaking. There was a significant amount of bleeding in different areas of his brain. The doctors who testified for the State also ruled out a host of improbable alternate theories proposed by Dulle that all share a common denominator: they all fail to fully explain every medical finding. Miles's death was not due to his preexisting condition of a floppy airway or related to any previous hospitalization.

Ultimately, the determination of the credibility and weight given to the medical testimony is a function of the jury, and speculation or conjecture was not necessary to find that Miles died of abusive head trauma. On medical evidence alone, Dr. Karen Farst, an expert witness who specializes in child-abuse pediatrics at Arkansas Children's Hospital, testified that she was able to narrow down the time of injury to a six-hour period. However, once the injury was sustained, Dr. Farst noted that, even had Miles not become immediately comatose or unresponsive, he would not have been described as "appearing well[.]" Nor would Miles have been able to take a bottle without looking unwell. Dr. Farst testified, based on over two decades of experience, that this type of traumatic injury would be immediately symptomatic.

The proof at trial established that Dulle acted knowingly because he was aware that his conduct, which caused Miles's devastating injuries, was practically certain to cause Miles's death. Although intent is rarely proved by direct evidence, it can be inferred from the circumstances of the crime. *E.g.*, *Steggall*, 340 Ark. at 190, 8 S.W.3d at 542. The head injuries were described as "neurological devastation" with a "very abnormal" intraventricular hemorrhage, brain swelling that was a "very severe finding[,]" and skull sutures that were "much, much too wide" because they were being pushed apart by the brain swelling. In addition, the bilateral retinal hemorrhage and macular fold were evidence of "very severe trauma." Simply put, Miles's death was due to violent shaking, and the jury could reasonably infer that Dulle was the person responsible.

Given our standard of review, we hold that substantial evidence supports the jury's verdict in the instant case. Accordingly, we affirm.

Affirmed.

GLADWIN and WHITEAKER, JJ., agree.

*Teri L. Chambers*, Arkansas Public Defender Commission, for appellant.

*Leslie Rutledge*, Att'y Gen., by: *Chris R. Warthen*, Ass't Att'y Gen., for appellee.