Cite as 2024 Ark. App. 305

# ARKANSAS COURT OF APPEALS
## DIVISION II
### No. CR-23-196

| | | |
|---|---|---|
| | | **Opinion Delivered** May 8, 2024 |
| DEVALIN WISEMAN | | |
| | APPELLANT | APPEAL FROM THE HOWARD COUNTY CIRCUIT COURT |
| | | [NO. 31CR-21-101] |
| V. | | |
| | | HONORABLE BRYAN L. CHESSHIR, JUDGE |
| STATE OF ARKANSAS | | |
| | APPELLEE | AFFIRMED |

**KENNETH S. HIXSON, Judge**

Appellant Devalin Wiseman was convicted in a jury trial of first-degree murder committed against his three-year-old son, MC. For this conviction, Wiseman was sentenced to thirty years in prison. Wiseman now appeals, and his sole argument is that there was insufficient evidence to support the verdict. Wiseman specifically argues that there was a lack of proof that he knowingly caused MC's death. We affirm.

Arkansas Code Annotated section 5-10-102(a)(3) (Supp. 2023) provides that a person commits first-degree murder if the person knowingly causes the death of a person fourteen years of age or younger. "Knowingly" is defined by Ark. Code Ann. § 5-2-202(2) (Repl. 2013):

(2) "KNOWINGLY." A person acts knowingly with respect to:

(A) The person's conduct or the attendant circumstances when he or she is aware that his or her conduct is of that nature or that the attendant circumstances exist; or

(B) A result of the person's conduct when he or she is aware that it is practically certain that his or her conduct will cause the result[.]

In reviewing a sufficiency challenge, we assess the evidence in the light most favorable to the State and consider only the evidence that supports the verdict. *Armstrong v. State*, 2020 Ark. 309, 607 S.W.3d 491. We will affirm a judgment of conviction if substantial evidence exists to support it. *Id.* Substantial evidence is evidence that is of sufficient force and character that it will, with reasonable certainty, compel a conclusion one way or the other without resorting to speculation or conjecture. *Id.* Circumstantial evidence may provide a basis to support a conviction, but it must be consistent with the defendant's guilt and inconsistent with any other reasonable conclusion. *Collins v. State*, 2021 Ark. 35, 617 S.W.3d 701. Whether the evidence excludes every other hypothesis is left to the jury to decide. *Id.* Further, the credibility of witnesses is an issue for the jury, not the court; the trier of fact is free to believe all or part of any witness's testimony and may resolve questions of conflicting testimony and inconsistent evidence. *Armstrong*, *supra*.

Wiseman lived in Mineral Springs with his girlfriend, Chasity Holmes. Also in the home were Chasity's two sons—ages five and four—and Wiseman's two sons—MC, age three, and MC's two-year-old brother. Wiseman had taken custody of his sons from their mother in Alabama about three months before MC's death on November 14, 2021.

Chasity testified about the events that occurred on November 14, 2021. They were at home that morning when Wiseman began to punish MC in the living room after MC had used the bathroom on himself and MC was cussing. Chasity stated that Wiseman began

whipping MC on his behind and back and that Wiseman was using a belt, a long wooden spoon, and his hand. MC was crying and begging Wiseman to stop. Chasity stated that she had previously seen Wiseman discipline MC as recently as a week prior, but this time, Wiseman was more upset, and this was above and beyond anything she had seen before. Chasity indicated that Wiseman was the only person to discipline MC that day and that he was constantly hitting MC. Chasity stated that MC was on his stomach and that Wiseman had his knee in MC's back, pinning him to the floor. Chasity stated that when Wiseman had MC on the floor whipping him, she began to feel uncomfortable, and she left the living room and went to another room with the other children.

Chasity testified that when she first left the living room, MC was still crying. However, sometime later, it got quiet, and she returned to the living room. Chasity testified that she saw MC lying motionless on the floor and his breathing was very faint. Chasity tried to perform CPR on MC and told Wiseman to call for help. Wiseman responded, "Wait, wait, I can't go to jail for hurting my baby." However, Chasity called 911, but because the ambulance was taking too long, Chasity drove to Howard Memorial Hospital while Wiseman sat in the backseat with MC, who was wrapped in a blanket.

Deputy Aaron Quick of the Howard County Sheriff's Department was dispatched to Wiseman's home in Mineral Springs but was then rerouted to Howard Memorial Hospital. Deputy Quick testified that he went to the emergency room and saw several doctors and nurses "working on a child [MC] who was laying on the bed motionless." As hospital staff continued their life-saving measures, Quick took photographs of MC's observable injuries.

3

Deputy Quick stated that there were severe injuries to MC and that "[he] knew by looking at the child it would be a major crime against this child so [he] wanted to document it." Deputy Quick stated that MC had multiple bruises all over his body, including his legs, arms, torso, and head. Deputy Quick also observed several lacerations that looked fresh as well as some that looked older and had "dried up." Deputy Quick noted that MC never moved nor spoke and that his eyes were open but he never moved them or blinked. Deputy Quick testified that after observing and photographing MC's condition, he "immediately stepped out of the room and called [his] sheriff and [his] investigators to come to the hospital due to the severity of the injuries of the child." MC was transported from Howard Memorial Hospital to Arkansas Children's Hospital, where he died later that day.

Chief Deputy Joey Davis conducted two Mirandized interviews with Wiseman that day, which were recorded and played to the jury. The first interview occurred while MC was still alive, and the second interview occurred after MC had passed away.

In the first interview, Wiseman stated that he had dropped out of high school in the eleventh grade but that he had obtained a GED. Wiseman confirmed in the interview that he understood his rights, and he agreed to give a statement. When asked about the incident earlier that day involving MC, Wiseman stated that he whipped MC because MC had used the bathroom on himself and was cussing and being disrespectful. Wiseman stated that he whipped MC only on his buttocks (although he probably also accidentally hit MC's back) and that he used a belt, a wooden spoon, and a white extension cord. In the first interview, Wiseman denied hitting MC with his hand. Wiseman stated that he whipped MC on and

4

off for thirty minutes that he "did kind of hit him hard," and that MC fell a couple times. Wiseman acknowledged in the first interview that he "should have never whipped him."

After Wiseman gave the first interview, investigators obtained a search warrant and searched Wiseman's residence for implements used to carry out the beating. During the search, investigators found a belt and a broken wooden spoon on the living room coffee table. The belt was doubled over and broken, and broken pieces of the spoon were also recovered. Beside the coffee table was an orange extension cord.

After the search and after MC had passed away, Chief Deputy Davis interviewed Wiseman a second time. During that interview, Wiseman was shown photographs of MC's injuries and was told that MC had died. Chief Deputy Davis asked Wiseman how MC got all the injuries to his head. In his first interview, Wiseman did not acknowledge hitting MC on his head; however, in the second interview, he admitted he had hit MC with his hand four times on his head and that he "hit him pretty hard." Wiseman stated that after the first two hits to MC's head, MC was not unconscious but appeared dizzy. In the second interview, Wiseman stated, "I didn't mean to go too far with it. I'm sorry, man."

Dr. Charles Kokes, a medical examiner at the Arkansas State Crime Laboratory, performed an autopsy on MC and testified for the State. Dr. Kokes documented extensive injuries to the child and noted that only MC's lower legs and feet were relatively free of external injury. Dr. Kokes testified that there were many linear and curved-patterned contusions and abrasions on MC's back, buttocks, shoulders, and the back of his thighs that were indicative of being whipped with a belt and an extension cord. Dr. Kokes also observed

similar injuries to MC's lower neck, chest, and abdomen. Dr. Kokes stated that there was bruising and abrasions to MC's right groin and right testicle, that MC's right arm showed areas of multiple injuries that were both fresh and healing, and that there were multiple injuries, both fresh and healing, to MC's face and the inside of his mouth. Dr. Kokes stated further that there was a wide area of confluent or total contusion that went from MC's left scalp over his left forehead area onto the left side of his cheek and almost down to his jawline.

Dr. Kokes also performed an internal examination that included the dissection of MC's internal organs. MC's internal injuries included a lacerated liver, perforation of the duodenum, and contusions of the pancreas with corresponding bleeding in the abdominal cavity. Dr. Kokes testified that the internal examination showed that MC had suffered a forceful blow to his abdomen and that the mechanism of injury was application of force that pushed the liver and other internal structures into the spine. Dr. Kokes also noted that there was scar tissue on MC's liver that indicated a level of healing anywhere from two weeks to several months. Dr. Kokes's internal examination also revealed hemorrhaging around MC's brain.

Dr. Kokes reported numerous blunt-force injuries on the skin surfaces of MC's head, neck, chest, abdomen, back, upper extremities, buttocks, and thighs. Dr. Kokes further reported that the extremely visible injuries were associated with massive hemorrhage in the underlying subcutaneous soft tissues. Dr. Kokes reported that the appearance of the injuries, their anatomic locations, and their severity left no doubt that they were sustained as a result of deliberate infliction. Dr. Kokes determined that MC died from multiple blunt-force

6

injuries and that the manner of death was a homicide. He also testified that MC's injuries were "completely inconsistent with any reasonable accidental scenario or situation."

On the evidence presented, the jury convicted Wiseman of first-degree murder based on its finding that Wiseman knowingly caused MC's death. Wiseman now appeals.

Wiseman's sole argument on appeal is that there was insufficient evidence to support his first-degree-murder conviction. Wiseman specifically argues that there was a lack of proof that he *knowingly* caused MC's death.[1] Wiseman asserts that it was not enough for the State to show that Wiseman knowingly whipped MC, nor was it enough for the State to show that Wiseman caused MC's death. Instead, Wiseman argues, the State was required to prove that he—a high-school dropout—was aware or practically certain that his whipping of MC would cause MC to die, and he submits that element of proof was missing. In support of this contention, Wiseman notes that when MC became unresponsive on the day of the beating, Wiseman exclaimed, "My baby can't die," and when investigators told Wiseman that MC had died during the second custodial interview, Wiseman insisted they were lying. Wiseman contends that in light of the evidence presented, the jury had to resort to speculation and conjecture to find that Wiseman knowingly caused MC's death.

---

[1]As support for his argument, Wiseman cites *Ackers v. State*, 73 Ark. 262, 83 S.W. 909 (1904), where Ackers' second-degree-murder conviction for killing his daughter by excessive whipping was reversed and remanded. However, *Ackers* did not involve a challenge to the sufficiency of the evidence supporting the conviction, and that case was reversed and remanded for a new trial due to the erroneous admission of prior bad acts and the failure to give a jury instruction based on a statute that no longer exists. Thus, *Ackers* is inapplicable.

In his argument, Wiseman further asserts that according to Dr. Kokes's testimony, some of MC's internal injuries occurred between two weeks and no more than several months prior to MC's death. Wiseman contends that there was no direct evidence as to how MC received these internal injuries and suggests that they may have been caused when MC was living with his mother in Alabama.[2] For the following reasons, we disagree with Wiseman's sufficiency challenge and conclude that there was substantial evidence to support the jury's verdict.

This court has noted that a criminal defendant's intent or state of mind is seldom apparent. *Benton v. State*, 2020 Ark. App. 223, 599 S.W.3d 353. One's intent or purpose, being a state of mind, can seldom be positively known to others, so it ordinarily cannot be shown by direct evidence but may be inferred from the facts and circumstances. *Id.* Because intent cannot be proved by direct evidence, the fact-finder is allowed to draw on common knowledge and experience to infer it from the circumstances. *Id.* Because of the difficulty in ascertaining a defendant's intent or state of mind, a presumption exists that a person intends the natural and probable consequences of his or her acts. *Id.* Additionally, the supreme court has held that circumstantial evidence supports a conviction if it is consistent with the defendant's guilt and inconsistent with any other reasonable conclusion and that this determination is a question of fact for the fact-finder. *Baughman v. State*, 353 Ark. 1, 110 S.W.3d 740 (2003).

---

[2]Chasity testified that Wiseman took custody of MC from MC's mother in Alabama in August 2021, which was about three months prior to MC's death.

Pursuant to Ark. Code Ann. § 5-2-202(2)(B), a person acts knowingly with respect to a result of the person's conduct when he is aware that it is practically certain that his conduct will cause the result. On the record, we hold that there was circumstantial evidence from which the jury could conclude, beyond speculation and conjecture, that Wiseman knowingly caused MC's death.

The evidence showed that Wiseman beat MC, who was just three years and two months old, for a period of thirty minutes until MC lost consciousness, became unresponsive, and died later that day. By Wiseman's admission in his custodial interviews, he administered the beating on MC with a belt, a wooden spoon, and an electrical cord. Although denying it in the first interview, in the second interview Wiseman admitted that he had also struck MC with his hand four times on his head. According to Wiseman's girlfriend, Wiseman had beaten MC in a similar manner, although not as severely, a week prior and on other occasions before that. On this occasion, Wiseman's girlfriend left the room due to the severity of the beating and the fact that Wiseman had pinned MC face down on the floor while MC pleaded with his father to stop hitting him. Wiseman, however, continued to beat MC to the point of unconsciousness and, ultimately, death.

Dr. Kokes testified that MC had suffered numerous internal and external injuries throughout almost all of his body and that MC's internal injuries included blunt-force trauma consistent with the use of a hand that crushed his internal organs into his spine, lacerated his liver, and caused internal bleeding. Dr. Kokes also documented hemorrhaging around MC's brain. Based on his examination of MC and the severity of MC's injuries, Dr.

9

Kokes stated that there was no doubt these injuries were the result of deliberate infliction and were completely inconsistent with any reasonable accidental scenario. Dr. Kokes ultimately determined that MC died from multiple blunt-force injuries and that the manner of death was a homicide.

This evidence was sufficient to demonstrate that Wiseman knew his conduct was of a deadly nature, and he was aware that it was practically certain that repeated blunt-force trauma to a three-year-old child's head and torso would result in death. *See Dulle v. State*, 2019 Ark. App. 378, 582 S.W.3d 28 (stating that a person acts knowingly with respect to the result when he strikes and shakes a child to death); *Stegall v. State*, 340 Ark. 184, 8 S.W.3d 538 (2000) (holding that appellant acted knowingly based on medical evidence of brain bleeding, bleeding in the eyes, fractures, and older injuries of the child that could not be caused by accidental trauma but were caused by shaking and slamming the child). Because we hold that substantial evidence supports the jury's finding that Wiseman knowingly caused MC's death, Wiseman's conviction for first-degree murder is affirmed.

Affirmed.

WOOD and BROWN, JJ., agree.

*Matt Kezhaya* and *Sonia Kezhaya*, for appellant.

*Tim Griffin*, Att'y Gen., by: *Kent G. Holt*, Ass't Att'y Gen., for appellee.